# 23-7564

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

WENDY ALBERTY,

*Plaintiff-Appellant,*

—against—

ROBERT A. HUNTER, SERGEANT STEPHEN J. SAMSON, DANIEL DEPTULA,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

NATHANIEL BABER
JONATHAN M. SHAPIRO
AETON LAW PARTNERS LLP
311 Centerpoint Drive
Middletown, Connecticut 06457
(860) 724-2160

*Attorneys for Plaintiff-Appellant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………ii

STATEMENT OF JURISDICTION…………………………………………1
    A. The District Court's Jurisdiction………………………………………1
    B. This Court's Jurisdiction……………………………………………1
    C. This Appeal is Timely………………………………………………2

STATEMENT OF ISSUES PRESENTED FOR REVIEW……………………2

STATEMENT OF THE CASE……………………………………………....3
    A. Nature of the Case………………………………………………....3
    B. Statement of Facts………………………………………………3
    C. Procedural History……………………………………………10
    D. The District Court's September 2023 Ruling…………………………11

SUMMARY OF ARGUMENT……………………………………………14
    A. Probable Cause Determinations…………………………………14
    B. Arguable Probable Cause/Qualified Immunity…………………….…15

ARGUMENT……………………………………………………………16
    A. The District Court Erred in Finding Probable Cause Existed to
       Arrest Ms. Alberty in Connection with
       Claim for False Imprisonment……………………………………16
    B. The District Court Erred in Finding Arguable Probable
       Cause Existed to Arrest Ms.Alberty……………………………….22
       1. Malicious Prosecution: Breach of Peace and
          Reckless Endangerment…………………………………………23
       2. Malicious Prosecution: Unlawful Restraint………………………...25
       3. Malicious Prosecution: Retaliatory Prosecution…………..……..32

CONCLUSION……………………………………………………...33

# TABLE OF AUTHORITIES

## CASES

*Ackerson v. City of White Plains,*
    702 F.3d 15 (2d Cir. 2012)................................................................27

*Anderson v. City of New York,*
    817 F. Supp. 2d 77 (E.D.N.Y. 2011)................................................20

*Baptiste v. J.C. Penney Co.,*
    147 F.3d 1252 (10th Cir. 1998)................................................ 21, 21

*Bernard v. U.S.,*
    25 F.3d 98 (2d Cir. 1994)................................................................17

*Boyd v. City of New York,*
    336 F.3d 72 (2d Cir. 2003)........................................................ 23, 24

*D'Angelo v. Kirschner,*
    288 F. App'x 724 (2d Cir. 2008) ............................................. 24, 24

*Demoret v. Zegarelli,*
    451 F.3d 140 (2d Cir. 2006)............................................................26

*Dorsett v. County of Nassau,*
    732 F.3d 157 (2d Cir. 2013)............................................................32

*Estrada v. Torres,*
    646 F. Supp. 2d 253 (D. Conn. 2009) ............................................19

*Ford v. McGinnis,*
    352 F.3d 582 (2  Cir. 2003)............................................................30

*Hartman v. Moore,*
    547 U.S. 250 (2006) ........................................................................32

*Hunter v. Bryant,*
    502 U.S. 224; 112 S. Ct. 534.................................................................29

*Jenkins v. City of New York,*
    478 F.3d 76 (2d Cir. 2007)........................................................... 19, 28

*Kerman v. City of New York,*
    261 F.3d 229 (2  Cir. 2001).......................................................... 28, 29

*Kerman v. City of New York,*
    374 F.3d 93 (2d Cir.2004)...................................................................27

*Klein v. Glick,*
    No. 3:19-CV-01056, 2020 WL 5097444 (Aug. 28, 2020)..............................29

*Kuehl v. Burtis,*
    173 F.3d 646 (8th Cir. 1999)................................................................30

*Lennon v. Miller,*
    66 F.3d 416 (2d Cir.1995)....................................................................27

*Lovelace v. City of New York,*
    No. 02-CV-5398; 2005 WL 552387 (E.D.N.Y. Mar. 9, 2005).......................24

*Manganiello v. City of New York,*
    612 F.3d 149 (2d Cir. 2010).................................................................16

*Marchand v. Hartman,*
    395 F.Supp.3d 202 (D. Conn. 2019).....................................................28

*McColley v. Cnty. of Rensselaer,*
    740 F.3d 817 (2d Cir. 2014).................................................................27

*McHale v. W.B.S. Corp.,*
    187 Conn. 444 (1982).........................................................................23

*O'Bert ex rel. Estate of O'Bert v. Vargo,*
    331 F.3d 29 (2d Cir. 2003)...................................................................26

*Oliveira v. Mayer*,
    23 F.3d 642 (2d Cir.1994) .................................................................27

*Panetta v. Crowley*,
    460 F.3d 388 (2d Cir. 2006) ...................................................... 17, 24

*Romero v. Fay*,
    45 F.3d 1472 (10th Cir.1995) ..................................................... 20, 21

*Sears v. Bradley*,
    667 F. Supp. 3d 1344 (M.D. Ga. 2023) .........................................19

*Sevigny v. Dicksey*,
    846 F.2d 953 (4th Cir.1988) ...........................................................21

*Stansbury*,
    721 F.3d 95 ......................................................................................23

*State v. Tony O.*,
    211 Conn. App. 496 (2022) ............................................................25

*Stonick v. Delvecchio*,
    438 F. Supp. 3d 154 (D. Conn. 2020) ...........................................27

*Walczyk v. Rio*,
    496 F.3d 139 (2d Cir.2007) .............................................................20

*Warren v. Dwyer*,
    906 F.2d 70 (2d Cir.) ......................................................................27

*Webster v. City of N.Y.*,
    333 F.Supp.2d 184 (S.D.N.Y.2004) ...............................................28

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ...................................................... 27, 30

STATUTES

Title 28 U.S.C.

    § 1291 ................................................................................................ 1

    § 1331 ................................................................................................ 1

    § 1332 ................................................................................................ 1

    § 1343(a)(3) ....................................................................................... 1

    § 1367(a) ........................................................................................... 1

Title 42 U.S.C.

    § 1983 ....................................................................... 1, 3, 10, 11

Appellant, Wendy Alberty ("Ms. Alberty"), respectfully submits this brief in support of her appeal from the United States District Court for the District of Connecticut (per Hall). The order, ruling and judgment from which this appeal is taken granted Defendants' Trooper Robert Hunter ("Hunter"), Lieutenant Stephen Samson ("Samson"), and Master Sergeant ("MS") Daniel Deptula's ("Deptula", collectively with Hunter and Samson, the "Defendants") motion for summary judgment on Plaintiff Wendy Alberty's claims for violation of 42 U.S.C. § 1983, False Arrest/Imprisonment, Malicious Prosecution, and Retaliatory Prosecution. The effect of this ruling was to end the case and a final judgment was entered on September 26, 2023.

## STATEMENT OF JURISDICTION

### A. The District Court's Jurisdiction

The District Court had jurisdiction under 42 U.S.C. § 1983, and the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. This Court also had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1343(a)(3) and (4) and supplemental jurisdiction over the claims arising out of Connecticut law pursuant to 28 U.S.C. § 1367(a).

### B. This Court's Jurisdiction

This Court has jurisdiction under 28 U.S.C. §1291 because the District Court's orders and judgment are final and the case was dismissed.

1

## C. This Appeal is Timely

The District Court's judgment entered on September 26, 2023. (A-1015).

Appellant's Notice of Appeal was filed on October 24, 2023 (A-1016), *i.e.*, within

thirty days of entry of the District Court's judgment.

## D. The Appeal is From a Final Judgment

This is an appeal from a final judgment of the District Court, which disposed

of all of the party's claims on September 26, 2023. (A-1015).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did the District Court err in granting Summary Judgment and finding

there was probable cause to arrest Ms. Alberty?

2.  Whether the District Court erred in granting Summary Judgment and

finding there was arguable probable cause to arrest Ms. Alberty.

3.  Whether the District Court erred in determining Defendants were

entitled to qualified immunity as to Ms. Alberty's claim for malicious prosecution.

4.  Whether the District Court erred in determining Defendants were

entitled to qualified immunity as to Ms. Alberty's claim for retaliatory prosecution.

5.  Whether the District Court erred in determining Defendants were

entitled to qualified immunity as to Ms. Alberty's claim of unreasonable search and

seizure.

## STATEMENT OF THE CASE

### A.     Nature of the Case

This case arises out of Defendants Hunter, Samson and Deptula's violation of Ms. Alberty's Constitutional rights, 42 U.S.C. § 1983, and the common law of Connecticut for her unlawful and wrongful arrest, malicious prosecution, and retaliatory prosecution acting under color of law by Defendants. In particular, Ms. Alberty alleged Defendants deprived her of her right to be free from unreasonable searches and seizures in violation of 42 U.S.C. § 1983, falsely arrested and imprisoned her, maliciously prosecuted her and retaliated against her in their prosecution of her even though they had evidence available that demonstrated the lack of probable cause.

### B.     Statement of Facts

Ms. Alberty is an adult female citizen of the United States residing in Rosell, New Jersey (A-0212). Hunter, at all relevant times was a Trooper First Class of the Connecticut State Police, Troop C. (A-0538) Samson, at all relevant times, was a Sergeant of the Connecticut State Police, Troop C (A-0303). MS Deptula, at all relevant times, was a Master Sergeant of the Connecticut State Police, Troop C (A-0786).

At the time of her arrest, Ms. Alberty was employed as a driver for Peter Pan Bus Lines with nearly thirty (30) years' experience as a bus driver. (A-0216; A-0082

3

at 1:04). She had no prior arrests let alone any convictions of any crimes. (A-0865; A-0292-293).

On August 4, 2019, Ms. Alberty was operating a passenger bus from Manhattan, New York, to Union Station in Hartford, Connecticut where the bus was scheduled to make a brief stop for a driver change. (A-0233). Another Peter Pan driver was scheduled to drive the passengers from Hartford to Boston, Massachusetts and Ms. Alberty was to ride along as a passenger. (A-0234).

While at Union Station for the changeover, a passenger (the "Passenger") exited the bus (although Ms. Alberty instructed the passengers it was not a rest stop), approached Ms. Alberty and asked Ms. Alberty if she could retrieve an item from her bag that was located inside the large luggage compartment under the bus. (A-0240-241; A-0244). Ms. Alberty agreed and opened the luggage compartment door for her. (A-0084 at 3:50). Although the Passenger identified her luggage as being "in the front" of the luggage compartment, meaning near the door, she was wrong. (A-0244). Her bag was not near the door and she did not inform Ms. Alberty of that. (A-0142).

Instead, while Ms. Alberty's face was turned as she engaged in a jovial conversation with another Peter Pan employee whose face was pressed against hers blocking her view, the Passenger climbed entirely within the luggage compartment

4

of the bus, without notifying, warning, or seeking permission from Ms. Alberty. (A-0084 at 4:04-4:05; A-0244; A-0245; A-0247).

Ms. Alberty continued her conversation with the other employee talking in his ear and with her face touching his face. Id. Alberty and this individual talked and each put an arm around each other, all while Ms. Alberty continued to hold the compartment door open. (A-0084 at 4:04-4:05). The other employee was facing the luggage compartment. (A-0084 at 4:04-4:05). After Ms. Alberty finished her conversation, she did not and could not see the Passenger since the Passenger climbed completely within the luggage compartment while Ms. Alberty's head was turned away; the other employee did not see the Passenger, either. (A-0245; A-0084 at 4:04-4:05).

Ms. Alberty had no reason to believe that the Passenger climbed entirely within the luggage bay because the Passenger told her the bag was near the door and she never told Ms. Alberty she was climbing entirely within the luggage compartment. (A-0142; A-0084; A-0244-246; A-0247). As a result, Ms. Alberty closed the door of the luggage compartment. (A-0084 at 4:04-4:05).

Prior to that, Ms. Alberty never expressed anger or frustration with the Passenger; did not argue with her; and did not make any statement that would indicate to any person that she was upset with the Passenger for asking to get something from her luggage. (A-0244-246). In fact, on that day Ms. Alberty was

5

described as being a "exemplary, fair, and professional employee while in the terminal and on her job." (A-0869), email from Pam Lassiter to Anne Miller. Ms. Alberty had 47 passengers on the bus that day and is not responsible for taking a head count to determine whether all passengers were back onboard. (A-0246-247).

After the bus left Hartford, the Passenger placed a 911 call from inside the luggage compartment. (A-0081). While traveling east on Interstate 84 toward Boston, Hunter initiated a traffic stop of the bus. (A-0082 at 5:44). After the bus was pulled over, Hunter informed the driver that Connecticut State Police Troop C dispatch received a 911 telephone call from a female stating she was locked in the luggage compartment of the bus. (A-0082 at 5:44).

The driver opened the luggage compartments, and the Passenger was inside. (A-0082 at 6:00, 13). Ms. Alberty was stunned when she walked off the bus and saw the Passenger; she was visibly shocked and confused and exclaimed "How'd you get there!" (A-0082 Part I, 7:05; 7:14-7:15).

Samson also arrived on scene and took command. (A-0120) Both Ms. Alberty and the Passenger spoke to Hunter within the first few minutes of the Passenger climbing out of the luggage compartment. Ms. Alberty denied knowing she was in there or that she deliberately locked her in there stating "I didn't know she was in there. She told me that she was going to get something." (A-0082 Part I, 7:28). The

Passenger identified Ms. Alberty and alleged Ms. Alberty saw her, laughed at her, and shut the door. (A- 0082 Part I, 7:18).

Within just 4 minutes after the Passenger was located, Trooper Kyle Kaelberer ("Trooper Kaelberer"), who also arrived at the scene, stated to Defendants Hunter and Samson "that's a 35-37 all day." (A-0082 Part I, 10:20-26). A "35-37" is an arrest. (A-0925; A-0933).

Samson verbally agreed with this assessment when he immediately responded "roger that." (A-0082 Part I, 10:20-10:26). At this point in time, the only information Defendants had was, as Hunter explained: "She was driving and said she locked the door on her." (A-0082 Part I, 10:20-10:26). Notably, however, Ms. Alberty was not placed under arrest at this point in time. Rather, Hunter, Samson and the other troopers continued gathering information and investigating the situation.

In fact, seconds after Trooper Kaelberer's "35-37" statement, Samson told Hunter: "They have it on video. They have something on video on that." (A-0082 Part I, 10:30-10:40). Approximately six minutes later, Hunter contacted dispatch and asked to have Troop H check the video of the bus at Union Station. (A-0082 Part I, 16:30).

Trooper Daniel Gonzalez ("Trooper Gonzalez") of Troop H was dispatched to the bus station (A-0089). At the bus station, Gonzalez viewed the video with an

employee from Peter Pan, and, upon viewing, immediately determined it was accidental—as did the Peter Pan employee. (A-0182).

Hunter admits in his police report that he requested the video taken from the bus station, and that Trooper Gonzalez viewed the footage. (A-0132). Samson admitted he received a phone call from dispatch while he was at the scene. (A-0436-437). During this call, he learned that Trooper Gonzalez reviewed the video and said that the incident appeared accidental. (A-0959; A-0436-437).

Approximately 38 minutes after Hunter pulled over the bus, he met again with Samson while Samson was in his motor vehicle to discuss the incident. (A-0082 Part I 38:40). During this discussion, after Hunter intentionally turned his body camera audio, Samson was on the phone. (A-0082, Part I 38:40-1:01; A-0724-725). The phone call was approximately 30 minutes after Samson told Hunter that "they have it on video" and Hunter was standing right next to him. (A-0082 Part I 10:40, 40:00).

Another nineteen (19) minutes passed before Ms. Alberty was advised she was being arrested. (A-0082 at 1:03). Within minutes of that, she was told "it might change." (A-0082 at 1:05) This occurred approximately an hour after Samson told Hunter that "they have it on video" and thirty (30) minutes after the phone call Samson received while Hunter was standing next to him with his audio muted. (A-0082, Part I 1:11, 40:00). Approximately eleven (11) minutes after she was told she was being arrested, Ms. Alberty was handcuffed, placed in Hunter's car, read her

Miranda rights and formally advised she was being charged with Reckless Endangerment and Breach of Peace. (A-0082, Part I 1:14:12).

Hunter brought Ms. Alberty to the Troop C barracks for processing. While doing so, Hunter received a phone call in which he was told by Trooper Blair that Trooper Gonzalez reviewed the video and that Trooper Gonzalez said "it clearly looks accidental." (A-0752-753; A-0959; A-0082, Part I 1:32). Defendant Hunter replied: "that's what we have the other side of the system for." (A-0082, Part I 1:32. 42). At the time of that call, the charge of unlawful restraint was not part of the charges. (A-0755-756).

In fact, the charge was only added after Ms. Alberty was given "an opportunity" by Hunter and Samson to give a statement but refused and told Defendants she would speak with a lawyer. (A-0082, Part II 5:50-10:20). As of 17:50, the original Notice of Rights form that Defendant Hunter filled did not include the charge of unlawful restraint. (A-0144). Yet, the form Ms. Alberty received had the charge of unlawful restraint handwritten in, and that form was not sent to the State's Attorney, only the first form was. (A-0144; A-0961). Hunter did not include Trooper Gonzalez' conclusion it was accidental in the report he prepared and transmitted to the State's Attorney. (A-0647).

The Criminal Appearance bond, however, included the charge of unlawful restraint, but that form was not signed by Hunter until 20:38, nearly two and a half

hours after he created the first Notice of Rights form. (A-0961). They added this charge despite the undisputed fact that they were both were aware that the only trooper who reviewed the video footage determined and communicated that Ms. Alberty did not knowingly and intentionally lock the Passenger in the luggage compartment (A-0959).

Ms. Alberty was released hours later, and, in October 2019, the State's Attorney unilaterally entered a *nolle prosequi* on the criminal charges against Ms. Alberty after she received the surveillance video from Ms. Alberty's defense counsel—not Hunter or Samson. (A-0128).

## B.    Procedural History

In July 2020, Plaintiff brought this action against Hunter and Samson pursuant to 42 U.S.C. § 1983, the First, Fourth and Fourteenth Amendments to the United States Constitution and the common law of Connecticut sounding in tort to redress her unlawful wrongful arrest, malicious prosecution, and retaliatory prosecution of Plaintiff on the part of the Defendants, acting under color of law. [Document 1] On September 15, 2020, Plaintiff filed an amended complaint. [Document 8] Hunter and Samson answered the Amended Complaint on February 23, 2022. [Document 38]

On March 9, 2022, Plaintiff moved to amend the complaint and join MS Deptula as an additional Defendant based on Samson's deposition testimony that

MS Deptula was responsible for the charges. [Document 43] On May 10, 2022, the Court granted Plaintiff's motion. [Document 58]. On May 10, 2022, Plaintiff filed its Second Amended Complaint. [Document 59]. The Second Amended Complaint alleges four counts against Defendants. In Count One, Plaintiff alleges Defendants violated 42 U.S.C. § 1983. In Count Two, Plaintiff alleges a claim for false arrest/false imprisonment against Defendants. In Count Three, Plaintiff alleges a claim for malicious prosecution against Defendants. In Count Four, Plaintiff alleges a claim for retaliatory prosecution against Defendants. On December 24, 2022, Defendants answered the Second Amended Complaint substantially denying the allegations. [Document 78].

Defendants moved for summary judgment on December 24, 2022. [Document 80]. Plaintiff opposed the motion for summary judgment on January 28, 2023. [Document 86]. Defendants filed a reply in support of their motion for summary judgment on February 11, 2023. [Document 88] Plaintiff filed a sur-reply in further support of her opposition on February 23, 2023. [Document 93].

### C.    The District Court's September 2023 Ruling

On September 26, 2023, the District Court granted Defendants' motion for summary judgment on all counts concluding, in sum, that probable cause existed to arrest Plaintiff with respect to Count Two, and arguable probable cause existed with

respect to Count One, Count Three and Count Four thereby providing Defendants with qualified immunity. The decision is reproduced in the Appendix at A-0982.

In its decision, the District Court first held that Defendants had probable cause to arrest Ms. Alberty for reckless endangerment and breach of peace. (A-0999). In so concluding, the District Court focused on the facts that Defendants knew a 911 call was made by someone claiming to be in the luggage compartment, that the Passenger emerged when Hunter pulled the bus over and had the luggage compartment opened, and the Passenger informed Hunter that Ms. Alberty saw her enter the luggage compartment and closed the door. (A-1008). The District Court also made note of the statement from another Peter Pan bus driver who stated the company had a policy forbidding drivers from letting passengers into luggage compartments—even though Ms. Alberty did not allow the Passenger into the luggage compartment (A-0985).

The District Court discounted Defendants knowledge about the surveillance video and stated it did not defeat probable cause. In doing so, the District Court first noted Defendants denied knowledge of the videotape's contents and that Ms. Alberty did not provide evidence to dispute or question their testimony—even though Ms. Alberty had. The District Court also found Defendants had no obligation to review the surveillance video in order to establish probable cause. Ultimately, the District Court concluded no reasonable juror could find Defendants lacked probable cause

to arrest Ms. Alberty. In doing so, however, the District Court failed to construe all evidence in the light most favorable to Ms. Alberty and failed to draw all inferences and ambiguities in her favor.

On the other hand, in granting summary judgment in favor of Defendants on Ms. Alberty's malicious prosecution claim, the District Court concluded Defendants did not have probable cause for the charges of false arrest and reckless endangerment by the time of Ms. Alberty's processing because Defendants knew about the video and Trooper Gonzalez' opinion that it was an accident, but continued to process her without looking into the potentially exculpatory evidence. Nevertheless, the District Court still granted summary judgment finding that Defendants were entitled to qualified immunity because arguably probable cause existed and officers of reasonable competence could disagree on whether the probable cause test was met in charging her with reckless endangerment and breach of peace. In reaching this conclusion, the District Court concluded the video was not "plainly exculpatory"— even though the District Court found the video "constituted compelling evidence that Ms. Alberty was not guilty of unlawful restraint." Again, the District Court failed to construe all evidence in the light most favorable to Ms. Alberty and failed to draw all inferences and ambiguities in her favor.

The District Court similarly found that Defendants lacked probable cause for the additional charge of unlawful restraint, but still found that they were entitled to

13

qualified immunity. In doing so and even though the Court found Hunter and Samson were wrong in adding the charge of unlawful restraint, the District Court still found their conduct (as well as that of MS Deptula) was not "so flawed that no reasonable officer would have made a similar choice."

Finally, the District Court granted summary judgment in favor of Defendants on Count One and Count Four of Ms. Alberty's Complaint on grounds that arguable probable cause existed and the officers were entitled to qualified immunity. In each instance, the District Court failed to construe all evidence in the light most favorable to Ms. Alberty and failed to draw all inferences and ambiguities in her favor.

## SUMMARY OF ARGUMENT

### A. Probable Cause Determinations

In its decision, the District Court first held that Defendants had probable cause to arrest Ms. Alberty for reckless endangerment and breach of peace. The District Court so held despite Defendants' failure to investigate and/or consider basic evidence available to them about the video at the time the arrest was made. The District Court's determination that probable cause existed with respect to the charges for false arrest and reckless endangerment conflicted with its later finding that probable cause did not exist at the time Ms. Alberty was processed given Defendants' knowledge about the video at such time. The only difference between the two findings was the District Court's conclusion that Defendants did not have knowledge of the video at the time the arrest was made. However, while Ms. Alberty

maintains Defendants knew about the video and its contents at the time she was arrested, at a minimum, genuine issues of material fact exist concerning what Defendants knew or did not know. However, the District Court failed to consider such evidence in the light most favorable to Ms. Alberty as required in a motion for summary judgment.

**B.     Arguable Probable Cause/Qualified Immunity**

The District Court's granting summary judgment on Ms. Alberty's remaining counts all rest on its conclusion that Defendants were entitled to qualified immunity because of the alleged existence of arguable probable cause. In reaching this conclusion, however, the District Court viewed the facts in the light most favorable to Defendants as opposed to Plaintiff as is required in a motion for summary judgment. Most significantly, its conclusion ran contrary to its own conclusions about the video (as well as everyone else's view of the video). The District Court determined that Defendants were "wrong" to add the charge of unlawful restraint given their knowledge of the video at the time that charge was added. The District Court also found the video "constituted compelling evidence" that Ms. Alberty was not guilty of unlawful restraint (or any other crime for that matter). The District Court's own conclusions concerning the video therefore demonstrates it failed to consider the facts in the light most favorable to Ms. Alberty.

**ARGUMENT**

**A.    The District Court Erred in Finding Probable Cause Existed to Arrest Ms. Alberty in Connection with her Claim for False Imprisonment.**

In concluding Defendants had probable cause to arrest Ms. Alberty for reckless endangerment and breach of peace, the District Court focused its attention on certain facts presented by Defendants construing those facts in the light most favorable to Defendants—as opposed to the light most favorable to Plaintiff. Not only that, the District Court ignored key facts before it concerning what information Defendants possessed and had available to them at the time of Ms. Alberty's arrest.

A central issue in this appeal concerns the existence of the video from the Peter Pan bus station and what Defendants knew about the video at the time of Ms. Alberty's arrest. The District Court's decision contained conflicting findings. In addressing Plaintiff's claims for malicious prosecution and retaliatory prosecution, the District Court noted an officer's "failure to make further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause." Citing *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).  It found "a reasonable juror could conclude ***it was unreasonable*** for the defendants, after hearing Trooper Gonzalez' opinion, to continue processing Ms. Alberty without

16

looking further into the potentially exculpatory footage." (emphasis added) (A-1004).

The District Court therefore determined it could not conclude Defendants had probable cause for such charges at the time of Ms. Alberty's processing (A-1004). Accordingly, given Defendants' knowledge of the video and Trooper Gonzalez' opinion, the District Court determined it could not conclude Defendants had probable cause to arrest Ms. Alberty.

In determining whether probable cause existed with respect to Ms. Alberty's false arrest claim, the District Court completely disregarded Ms. Alberty's argument Hunter and Samson knew of the video at the time she was arrested. The District Court relied on Defendants' self-serving declarations claiming they did not know of the video's contents until after Ms. Alberty was arrested (A-1000). The District Court claimed Ms. Alberty did not provide any evidence to dispute or question this testimony of Hunter and Samson. This conclusion was not an accurate reflection of the record.

In assessing whether an officer had probable cause for an arrest, a court must look at "the totality of the circumstances." *Panetta*, 460 F.3d 388, 395 (2d Cir. 2006); *see also Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994) (citations omitted). The District Court failed to do so when determining whether probable cause existed.

17

First, the District Court cited to Samson's declaration submitted in support of Defendants' motion for summary judgment for the proposition that Samson did not learn about the contents of the video until after Ms. Alberty was placed in custody by Hunter and en route to Troop C. The evidence provided by Ms. Alberty contradicts this statement. First, there is no question Hunter and Samson knew about the existence of the video at the time Ms. Alberty was arrested—while still at the scene (A-0638). A mere ten (10) seconds after Trooper Kaelberer said it was a "35-37", Samson told Hunter: "They have it on video. They have something on video on that." (A-0082 Part I, 10:30-10:40). Hunter admits in his report he requested the video taken from the bus station, and that Trooper Gonzalez viewed the footage. (A-0132). Thus, there is no question Defendants knew the video existed at the time they arrested Ms. Alberty more than an hour later.

More importantly, as to whether Defendants knew the contents of the video and contrary to the District Court's conclusion, Samson admitted he received a phone call from a dispatcher informing him that Trooper Gonzalez reviewed the video and said the incident appeared accidental *while he was still at the scene*. (A-0959; A-0436-437). Yet Samson's declaration does not state he learned about Trooper Gonzalez' opinion while still on the scene—in fact, he suggests otherwise by stating Ms. Alberty was already en route to Troop C when he allegedly learned

about Trooper Gonzalez' opinion. Very simply, Samson's declaration conflicts with his deposition testimony.

Thus, there is no question Defendants knew the video existed and that Samson learned of its contents while still at the scene. Moreover, at a minimum, issues of material fact exist as to what Defendants knew or did not know about the video at the time Ms. Alberty was arrested. However, instead of viewing the facts in the light most favorable to Plaintiff, the District Court ignored and discounted this evidence. When the sequence of events, including the fact that Ms. Alberty was not arrested until more than an hour after the bus was pulled over, an issue of material fact clearly exists regarding whether Defendants knew about Trooper Gonzalez' conclusions prior to arresting Ms. Alberty.

A probable cause determination cannot stand "on the unsupported statements of interested officers, when those statements have been challenged and countered by objective evidence." *Sears v. Bradley*, 667 F. Supp. 3d 1344, 1357 (M.D. Ga. 2023). The District Court "was obligated to construe" the factual ambiguity concerning the timing of Defendants' knowledge of the contents of the video in Ms. Alberty's favor. *See Jenkins v. City of New York*, 478 F.3d 76, 89 (2d Cir. 2007) (citations omitted). "Instead, the district court construed the facts in favor of the [officers]." *Id.*

"Where parties dispute what facts were known to police officers at the time an individual was arrested, resolution is for the jury . . .". *Estrada v. Torres*, 646 F.

Supp. 2d 253, 257–58 (D. Conn. 2009) *citing Walczyk v. Rio,* 496 F.3d 139, 157 (2d Cir.2007). Summary judgment is simply not appropriate where there is a dispute as to the facts and knowledge of the officer as there is here. *See, e.g., Anderson v. City of New York*, 817 F. Supp. 2d 77, 88 (E.D.N.Y. 2011).

Even if Defendants did not know about Trooper Gonzalez' opinion of the video prior to Ms. Alberty's arrest, they still had a duty to investigate its contents given their knowledge of its existence. In support of its conclusion, the District Court noted police officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest . . . Indeed, courts in this Circuit have expressly held that police do not have to review surveillance video in order to establish probable cause." [internal citations omitted] (A-1001). However, this does not end the inquiry.

The District Court itself recognized, in evaluating the malicious prosecution claim, that "an officer's 'failure to make inquiry when a reasonable person would have done so may be evidence of a lack of probable cause." (A-1004). While an officer is not required to explore and eliminate every plausible claim, an officer must conduct a reasonable investigation to establish probable cause including, as other Circuits have described, reasonably interviewing witnesses available at the scene and investigate basic evidence. *See, e.g., Romero v. Fay,* 45 F.3d 1472, 1476–77 (10th Cir.1995). "[W]hen a videotape of the conduct at issue is ***both known and***

*readily accessible* to an officer investigating an alleged crime, the officer ***must view*** the videotape so as to avoid improperly delegating the officer's duty to determine probable cause." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1257 (10th Cir. 1998) (citation omitted).

"While officers are not required to conduct full investigations before making an arrest, an officer may not ignore a videotape which records the alleged criminal acts." *Id. citing Romero v. Fay,* 45 F.3d 1472, 1476–77 (10th Cir.1995) (noting that the probable cause standard requires officers to "investigate basic evidence"); *Sevigny v. Dicksey,* 846 F.2d 953, 957–58 (4th Cir.1988) (holding officer who failed to "avail himself of readily available information" which would have confirmed plaintiff's explanation of events was not entitled to qualified immunity for unlawful arrest).

Here, based on Defendants knowledge of the video and Trooper Gonzalez' statement about what it showed, the District Court determined Defendants lacked probable cause in the context of the malicious prosecution claim yet determined Defendants had probable cause in the context of the false arrest/imprisonment claim even though knowledge of the video existed, and, at a minimum, issues of material fact existed as to what Defendants knew and did not know about the video.

Finally, in determining whether probable cause existed, the District Court was required to view the "totality of the circumstances." This includes the statements of

not only the Passenger, but Ms. Alberty, and the circumstances surrounding the Passenger entering the luggage compartment. To believe probable cause existed considering the totality of the circumstances, including Defendants' knowledge of the statements of both the Passenger and Ms. Alberty, any reasonable person would have to believe that Ms. Alberty, a veteran bus driver of over thirty (30) years, decided to lock a complete stranger in the luggage compartment of a bus preparing to travel nearly two hours in August knowing it would be captured on video. Given the information available to Defendants, no reasonable person could come to such a conclusion when viewing the facts in the light most favorable to Ms. Alberty.

For all these reasons, the District Court's determination Defendants had probable cause to arrest Ms. Alberty was in error.

### B. The District Court Erred in Finding Arguable Probable Cause Existed to Arrest Ms. Alberty.

With respect to Ms. Alberty's remaining claims, the District Court granted summary judgment on each of them based on its determination that arguable probable cause existed thereby providing Defendants with qualified immunity. Again, it bears noting that in conducting its analysis of Ms. Alberty's claims for malicious prosecution, retaliatory prosecution and unreasonable search and seizure,

the District Court concluded Defendants *lacked* probable cause for purposes of those claims.[1] (A-1001).

    1.    Malicious Prosecution: Breach of Peace and Reckless Endangerment.

The District Court broke down it analysis of Ms. Alberty's malicious prosecution claim by the charges brought against her. To prove malicious prosecution, a plaintiff must prove four elements: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice". *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (1982). As the District Court noted, the parties did not dispute that Ms. Alberty has met the first two elements. (A-1001). "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

The Second Circuit has described the probable cause standard in the malicious prosecution context as "slightly higher than the standard for false arrest cases." *See Stansbury*, 721 F.3d at 95. The "[d]etermination of probable cause . . . must be evaluated in light of the facts known or believed at the time the prosecution is

---

[1] The District Court also concluded that even if probable cause existed to arrest Ms. Alberty for breach of peace and reckless endangerment, arguable probable cause still existed thereby justifying summary judgment.

initiated, rather than at the time of the arrest." *Lovelace v. City of New York*, No. 02-CV-5398, 2005 WL 552387, at *2 (E.D.N.Y. Mar. 9, 2005).

Probable cause for an arrest is generally a "complete defense to a claim of malicious prosecution", unless "exculpatory facts" become known after the arrest. *D'Angelo v. Kirschner*, 288 F. App'x 724, 726 (2d Cir. 2008). An officer may not disregard "plainly exculpatory" evidence. *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). Importantly, "a finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges". *D'Angelo*, 288 F. App'x at 726. Moreover, the Second Circuit has held that "[a] lack of probable cause generally creates an inference of malice". *Boyd*, 336 F.3d at 78.

As noted above, the District Court affirmatively found Defendants lacked probable cause for the reckless endangerment and breach of peace charges at the time of processing because they knew the video existed and Trooper Gonzalez' conclusions about the video yet failed to look into such footage themselves (A-1004). As a result, the District Court turned its analysis to whether arguable probable cause existed.

It explained that arguable probable cause exists if "any reasonable officer . . . could have determined that [probable cause existed]." (A-1005). After concluding that Defendants did not have probable cause, the District Court still found a

reasonable officer could have concluded that probable cause existed to charge Ms. Alberty with reckless endangerment and breach of peace. In doing so, the District Court relied on the "other reasons" to believe Ms. Alberty acted recklessly given another bus driver's statement "suggesting" she violated company safety standards.

There was no evidence Ms. Alberty violated a company policy forbidding drivers from letting passengers into luggage compartments. Ms. Alberty did not let the Passenger into the luggage compartment. She merely opened it to allow the Passenger access to her bag. By the Passenger's own admission, she "crawled in to get" her charger. (A-0983). This is simply an example of the District Court's failure to view the evidence in the light most favorable to Ms. Alberty as it is required to do. The District Court's opinion is at odds with itself. It determined Defendants lacked probable cause but then gave them a pass by viewing the evidence in the light *least* favorable to Ms. Alberty. The District Court's conclusion was in error.

2. Malicious Prosecution: Unlawful Restraint

The District Court next examined Ms. Alberty's malicious prosecution claim in the context of the unlawful restraint charge. Unlawful restraint "requires proof not only that the defendant actually restricted the complainant's movements in such a manner as to interfere substantially with her liberty, without her consent, but that [s]he did so intentionally, that is, with the 'conscious objective' of causing that result." *State v. Tony O.*, 211 Conn. App. 496, 516 (2022), cert. denied, 343 Conn.

921 (2022). The District Court again concluded Defendants lacked probable cause to charge Ms. Alberty with the unlawful restraint charge since Defendants knew of Trooper Gonzalez' conclusions about the video, and turned its analysis to whether Defendants had arguable probable cause and were entitled to qualified immunity (A-1007).

"A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him is not prohibited by federal law. . . ; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct...; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) (citations, quotation marks and ellipses omitted).

"A defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." *Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006) (emphasis added).

The District Court explained that qualified immunity is a "forgiving standard." (A-1008). While the arguable probable cause standard is "more

favorable" to officers than the probable cause standard, it is not "toothless"—qualified immunity will not apply if reasonable officers "would have to agree" that the information does not "add up" to probable cause—even if it "came close." *Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012). It was not intended to "swallow[ ] all such doubtful cases, ensuring that . . . a jury trial will in fact never be realized." *Stonick v. Delvecchio*, 438 F. Supp. 3d 154, 167–68 (D. Conn. 2020) *citing McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 831 (2d Cir. 2014).

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner v. Summerlin*, 494 F.3d 344, 367–68 (2d Cir. 2007) *citing Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004) ("*Kerman* "); *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995) ("*Lennon* "); *Oliveira,* 23 F.3d at 649–50; *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.) ("*Warren* "), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

While the ultimate question of whether officers of reasonable competence could disagree as to the lawfulness of the conduct at issue is decided by the court, the inquiry "has its principal focus on the particular facts of the case." *Id*. *citing Kerman,* 374 F.3d at 109. "If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court. . . . ***[I]f there is such a dispute*** . . . ***the factual questions must be resolved by the factfinder***." *Id*. (citations omitted); *see also*

*Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; *otherwise, jury consideration is normally required.*") (emphasis added) (internal citations and quotation marks omitted) (citing *Webster v. City of N.Y.,* 333 F.Supp.2d 184, 206 (S.D.N.Y.2004)) (denying qualified immunity as a matter of law for malicious prosecution claim where dispute existed as to facts which constituted alleged basis for probable cause).

Significantly, the qualified immunity defense is not available when an officer fails to consider exculpatory evidence during an arrest. *Kerman v. City of New York*, 261 F.3d 229 (2nd Cir. 2001); *see also Marchand v. Hartman*, 395 F.Supp.3d 202, 219 (D. Conn. 2019) ("easily available exculpatory evidence may void probable cause.") (citations omitted). In determining whether arguable probable cause exists, this Court "examine[s] the same evidence under the same circumstances and evaluate[s] 'whether it was objectively reasonable for the officer to conclude that probable cause existed.'" *Jenkin,* 478 F.3d at 87.

The Second Circuit has cautioned that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause.... If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does

28

not immunize the officer." *Klein v. Glick*, No. 3:19-CV-01056 (SRU), 2020 WL 5097444 (Aug. 28, 2020), at *4, *citing Jenkins*, 478 F.3d at 87. Rather, the test for arguable probable cause is "whether it was objectively reasonable for the officer to conclude that probable cause existed." *Jenkins*, 478 F.3d at 87. Qualified immunity does not protect the "plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 537 589 (1991).

*Kerman v. City of New York* is instructive. In that case, the court denied qualified immunity to an officer on grounds he refused to consider exculpatory evidence during an arrest. There, officers arrived at Kerman's residence after a 911 caller stated that "a mentally ill man at this location was off his medication and acting crazy and possibly had a gun." *Kerman*, 261 F.3d at 232.

When the officers arrived at his home, they spent more than an hour searching the apartment and observing the suspect's behavior. *Id.* at 240. When paramedics arrived at the scene, they called Kerman's psychiatrist and Kerman spoke briefly with him. *Id.* at 233. After Kerman made a statement to his psychiatrist that an officer apparently did not like, the officer grabbed the phone and hung up without asking the doctor about Kerman's mental health. *Id.* Kerman was then hospitalized. *Id.* at 233-34.

Reversing the district court's grant of summary judgment to the lead officer, the Second Circuit explained that "the officers had the opportunity to consult a

medical professional familiar with the patient's condition" and it "[could not] see the reasonableness of hanging up on a doctor in such a situation." *Id.* at 241. It further found that "the officers deliberately ignored [the opportunity] to confirm the seriousness of Kerman's condition . . ." *id.*, and explained that "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence." *Id. quoting Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999)).

Given the availability of the information about the video surveillance, Ms. Alberty's explanation, and Trooper Gonzalez' opinion, no reasonable officer would ignore the information available to them, including Trooper Gonzalez' opinion without doing more. At a minimum, issues of material fact remain regarding whether "arguable probable cause" existed concerning what information Defendants had available to them. *See, e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 368 (F.2d 2007); *Ford v. McGinnis*, 352 F.3d 582, 597 (2nd Cir. 2003) (summary judgment on qualified immunity is only available if the evidence is such, when viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in her favor, no rational jury could find it objectively reasonable for the defendants to believe they were acting in a manner that did not violate a right).

In an effort to justify its decision finding qualified immunity applied, the District Court further concluded the video "was not plainly exculpatory" and

determined that that Hunter and Samson's decision to add the unlawful restraint charge despite knowledge of the video and Trooper Gonzalez' conclusion was "not 'so flawed that no reasonable officer would have made a similar choice.'" (A-1009).

The District Court's determination was flawed. It runs contrary to its own conclusion, and is based on the District Court's failure to view the facts in the light most favorable to Ms. Alberty as required in considering a motion for summary judgment. As discussed above, the District Court concluded probable cause did not exist given what was known about the video at the time Ms. Alberty was processed, and that Hunter and Samson were "wrong" to add the charge of unlawful restraint given such information. The District Court went so far to say that the video "constituted compelling evidence that Ms. Alberty was not guilty of unlawful restraint." (A-1008). The District Court's own conclusions concerning the video therefore demonstrates it failed to consider the facts in the light most favorable to Ms. Alberty.

Moreover, every objective person that viewed the video, including the District Court, Trooper Gonzalez, the Peter Pan employee who viewed the video with Trooper Gonzalez, Trooper Kaelberer, and the Connecticut State's Attorney handling the criminal charges, all determined Ms. Alberty did not commit a crime when she closed the luggage compartment. (A-0890; A-0128). Accordingly, viewing the facts in the light most favorable to Ms. Alberty, no reasonable officer would have

made a similar choice as Defendants. The only way such a decision could be found otherwise is to ignore the totality of the circumstances and all information available to Defendants. The District Court erred in its holding.

3.    Malicious Prosecution: Retaliatory Prosecution

Finally, the District Court addressed Ms. Alberty's retaliatory prosecution claim. In her retaliatory prosecution claim, Ms. Alberty alleged that as a result of her decision not to provide a statement, Defendants added the unlawful restraint charge against her (A-0023). In order to survive summary judgment, a plaintiff must establish that "(1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by h[er] exercise of that right; and (3) the defendant's actions caused h[er] some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). A plaintiff must also show a lack of probable cause. *See Hartman v. Moore*, 547 U.S. 250, 265 (2006).

Given the District Court's determination that Defendants had arguable probable cause to add the unlawful restraint charge, it determined Defendants were entitled to qualified immunity on Ms. Alberty's retaliatory prosecution claim. For the reasons set forth above, the District Court erred in finding arguable probable cause.

## CONCLUSION

For the reasons stated above, Appellant Wendy Alberty respectfully requests that this Court enter an order reversing the September 26, 2023 ruling and granting Defendants' motion for summary judgment, and remand the case to the District Court.

Dated: March 1, 2024          Respectfully Submitted

APPELLANT-WENDY ALBERTY

By: /s/ Jonathan M. Shapiro
Jonathan M. Shapiro
Nate Baber
Aeton Law Partners, LLP
311 Centerpoint Drive
Middletown, CT 06457
(860) 724-2160
jms@aetonlaw.com
nate@aetonlaw.com

Attorneys for Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 7,432 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: March 1, 2024　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　　/s/ Jonathan M. Shapiro
　　　　　　　　　　　　　　　　　Jonathan M. Shapiro

SPECIAL APPENDIX

TABLE OF CONTENTS

Ruling on Defendant's Motion for Summary Judgment………………SPA-1

Judgment, dated September 26, 2023…………………………………SPA-034

SPA-001

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| WENDY ALBERTY, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:20-CV-01014 (JCH) |
| v. | : | |
| | : | |
| ROBERT A. HUNTER, | : | |
| STEPHEN J. SAMSON, and | : | |
| DANIEL DEPTULA, | : | SEPTEMBER 26, 2023 |
| Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 80)**

**I.      INTRODUCTION**

Plaintiff Wendy Alberty ("Ms. Alberty") brings this action under section 1983 of title 42 of the United States Code and Connecticut state law against defendants Robert A. Hunter ("Trooper Hunter"), Stephen J. Samson ("Sergeant Samson"), and Daniel Deptula ("Master Sergeant Deptula").  See Second Amended Complaint ("Am. Compl.") (Doc. No. 59).  Ms. Alberty alleges deprivation of her Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures, false arrest/false imprisonment, malicious prosecution, and retaliatory prosecution over the exercise of her First Amendment rights.

Before this court is the defendants'' Motion for Summary Judgment, see Defendants' Motion for Summary Judgment ("Defs.' Mot.") (Doc. No. 80), which Ms. Alberty opposes, see Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp.") (Doc. No. 86).  For the reasons set forth below, the Motion is granted.

1

## II.    BACKGROUND[1]

### A.    Factual Background

On August 4, 2019, a 911 call was placed from inside the luggage compartment of a Peter Pan bus.  Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s LR 56(a)2 Stmt.") ¶ 8 (Doc. No. 86).[2]  Upon request for clarification by 911 dispatch, the caller (hereinafter "Passenger") exclaimed, "[the driver] locked me under the bus with the luggage!"  Id. at ¶ 10.  Trooper Hunter initiated a traffic stop and pulled over the Peter Pan bus, thereafter requesting the driver to open the luggage compartments.  Id. at ¶¶ 15, 17. When the second luggage compartment was opened, the Passenger was found trapped inside.  Id. at ¶ 18.

### 1.    On-Scene Statements

The accounts of the Passenger and Ms. Alberty of how the Passenger wound up in the luggage compartment differed sharply.  When Ms. Alberty got off the bus a few minutes after it was pulled over, the Passenger "immediately identified" her as the person who had locked her under the bus, claiming "you saw me, you laughed and shut the door!"  Id. at ¶¶ 24-25.  The Passenger insisted to Trooper Hunter and Sergeant Samson, both of whom were on the scene, that Ms. Alberty "knew [she] was under there and [Ms. Alberty] laughed and shut the door" and claimed, "[Ms. Alberty] saw me, she knew that I was in there, she locked me up in there . . . I'm not okay!"  Id. at ¶¶ 28-

---

[1] The court draws from the parties' Local Rule 56(a) Statements and supporting exhibits in summarizing the material facts.  As it must, the court construes all disputed facts in the light most favorable to Ms. Alberty, the non-moving party.  Where appropriate, the court notes where the parties disagree as to what happened.

[2] For ease of reference, the court cites primarily to Ms. Alberty's Local Rule 56(a)2 Statement because, in accordance with Local Rule 56(a)2, it contains a reproduction of each numbered paragraph from the defendants' Local Rule 56(a)1 Statement, as well as Ms. Alberty's admissions and denials.

29 (ellipsis in original).  In a sworn statement given to non-defendant Trooper Kyle

Kaelberer ("Trooper Kaelberer"), who was also at the scene, the Passenger described

the events leading to her confinement as follows:

> I boarded a Peter Pan Bus at the Port Authority in Manhattan at
> approximately 1 PM to travel to Boston.  The bus stopped in Hartford
> Connecticut and while on this break I wanted to get my phone charger from
> my luggage that was under the bus in the cargo hold . . . I crawled in to go
> get my charger and the female driver said "Ha!  [E]njoy the ride!" and shut
> the cargo door, trapping me inside.  I thought it was a joke at first but then
> started banging on the door and yelling "hey!" but no one came back.
> Approximately 5-6 minutes later the bus began to move.

Prosecutor's File, Defs.' Ex. I, at 16 (Doc. No. 80-11).  The Passenger further confirmed

with Trooper Kaelberer that, after Ms. Alberty opened the luggage compartment door

and the Passenger entered, Ms. Alberty did not walk away from the door—rather, Ms.

Alberty closed the door "within seconds" of the Passenger's entry.  Kaelberger MVR,

Defs.' Ex. C, at 23:33-23:53 (Doc. No. 80-5).

Ms. Alberty, on the other hand, denied knowing that the Passenger was in the

compartment and locking her in there.  See Hunter's Bodycam Footage Pt. I ("Bodycam

Pt. I"), Pl.'s Ex. B, at 7:27-7:38 (Doc. No. 80-4).  Her first words upon seeing the

Passenger were, "How'd you get in there!"  Id. at 7:14-7:15.  When the Passenger

responded that Ms. Alberty had "laughed and shut the door", Ms. Alberty turned to

Trooper Hunter and explained, "I didn't know she was in there.  She told me that she

was going to get something, this driver [pointing to the other driver] took over for 15

minutes, I came out and we was all on the bus, so . . . ."  Id. at 7:27-7:37.  About an

hour later, Ms. Alberty later gave a more detailed explanation to Trooper Hunter:

> [The Passenger] asked me to go in there and I wasn't even supposed to let
> her in but I told them the camera is on the bus to see me telling you when
> we got to Hartford that's not a rest stop, we are picking up a driver and we

3

are leaving.  [The Passenger] got off the bus and [she] asked me, "Can I go get something in my bag?"  I opened the luggage bin, I don't know what she did, I walk away, I talk to them, I wait for [the other driver], then everybody got on the bus, I close [the bin].  I'm right—if [she saw] me close [it] why didn't [she] say something?  [I heard] nothing, I was right here! . . . [She'd] see my foot—she'd see me!  So I want to know why she didn't say nothing . . . .

Id. at 1:04:31-1:05:06.  When Sergeant Samson walked over a few minutes later, Ms. Alberty remained adamant that she did not know the Passenger was in the compartment, did not see the Passenger enter, that she had walked away for "ten or twelve minutes" and that, when she returned, she unlocked the safety latch and heard nothing from the Passenger before closing the compartment.  Id. at 1:08:30-1:09:05.

A statement was also taken from Gary Jeanbaptiste ("Mr. Jeanbaptiste"), the driver who had taken over for Ms. Alberty when the bus stopped in Hartford:

I am a driver for the Peter Pan bus company. . . .  Today I drove a bus from Boston to Hartford, CT.  I then took over for a bus that had come out of New York that was to be driven back to Boston.  I took over driving for [Ms.] Alberty. . . .  [W]hen I took over driving for her she had already checked all the underside compartments and closed them up.  She did this because since she is responsible for this bus she is responsible to make sure all the compartments are closed.  While she was doing this I [was] seated in the drivers seat doing the pre trip checks that I am responsible for.  When she came back onto the bus I asked her if everything was all set and she told me that it was.  At that point I looked out of the windows to verify that the luggage compartments were all closed and since they were I left the Hartford Terminal to continue the trip to Boston.  [Ms. Alberty] never mentioned to me that she allowed a passenger . . . into the luggage bay prior to us leaving Hartford.  It is also Peter Pan policy that we do not let passengers into the bays and the drivers usually only handle baggage during loading and unloading times.

Prosecutor's File at 17.

### 2.    Decision to Arrest Ms. Alberty

Within minutes of releasing the Passenger from the luggage compartment and hearing her insistence that she had been deliberately closed in by Ms. Alberty, Trooper

SPA-005

Hunter spoke with Sergeant Samson and Trooper Kaelberer, who were also on the

scene.  Bodycam Pt. I at 10:00.  Trooper Hunter explained that the Passenger said that

Ms. Alberty had "locked the door on her", and Trooper Kaelberer replied, "Well, there's

no reason for [the Passenger] to lie about that. . . .  I'd say it's a 35-37[3] all day."  Id. at

10:12-10:26.  Sergeant Samson's immediate response was "roger that", id. at 10:25,

and he then informed Trooper Hunter that there was footage from the bus station: "They

have it on video. They have something on video on that[,]" id. at 10:32-10:38.  Sergeant

Samson asked Trooper Hunter to ask someone from Troop H to go "find out about the

video", id. at 13:01-13:09, and Trooper Hunter relayed the request to Dispatch shortly

thereafter, id. at 16:25-17:00; accord Prosecutor's File at 6.

Trooper Kaelberer took the Passenger's statement from his vehicle, and the

Passenger stayed there while Trooper Hunter and Sergeant Samson walked the scene.

At one point, Sergeant Samson came by the vehicle and asked the Passenger, inter

alia, how quickly the bus departed after the Passenger was closed in the compartment.

Kaelberger MVR at 57:40-58:00.  The officer noted that the Passenger's answer—that it

was only "a few minutes"—"confirm[ed] what [Mr. Jeanbaptiste] was saying".  Id.  The

Passenger then learned that the officers were planning to arrest Ms. Alberty, and she

told Trooper Kaelberer that she "fe[lt] bad".  Id. at 58:00-58:04.  A few minutes later, the

Passenger repeated that she "d[id not] really want [Ms. Alberty] to be arrested", id. at

1:00:13-1:00:17, at which point Trooper Kaelberer called Sergeant Samson back to the

car, id. at 1:00:55-1:00:59.  Trooper Kaelberer then told the Passenger:

---

[3] A "35-37" is an arrest.  See Deposition of Kyle Kaelberer, Pl.'s Ex. C, at 52:19-23 (Doc. No. 86-8).

I just want us all to be on the same page, okay?  Because, it does have serious ramifications. . . .  What [Ms. Alberty] did is, by the letter of the law, illegal.  It's reckless endangerment, okay?  But, our prosecutor—if you say you don't want her arrested, they're going to want to know that.  But what . . . could prevent her from doing this again to someone else?

Id. at 1:01:07-1:01:34.  Sergeant Samson, who had returned to the car, spoke next: "We're not here to convince your mind if you're saying you don't want to press charges, alright?  That's entirely up to you, ma'am. . . .  We will document that this did take place, but . . . ."  Id. at 1:01:35–1:01:46.  Sergeant Samson and Trooper Kaelberer expressed that, if the Passenger "d[id not] want to press charges, there [was] nothing [they] could do" about what Ms. Alberty did from there.  Id. at 1:01:45-1:02:22.

Over the next twelve minutes, the Passenger struggled over whether she wanted Ms. Alberty arrested.  Id. at 1:02:22-1:12:09.  Sergeant Samson explained that, if Ms. Alberty was arrested, she would eventually go to court and it was "going to be [her] word against [the Passenger's] word", that the Passenger was "going to have to testify about [her] story . . . ."  Id. at 1:10:33-1:10:45.  Sergeant Samson also explained that, as a result of the police being called to the scene, Ms. Alberty's boss was already aware of what happened.  Id. at 1:11:36-1:11:39.  "So no matter what, she's going to get some sort of ramification for what she did by her boss," Sergeant Samson continued, "So . . . if you don't press charges, she's going to get, probably, reprimanded by her boss anyway.  She's claiming that you crawled in there and she didn't know you went in there at all. . . .  So what do you want to do, ma'am?"  Id. at 1:11:40-1:12:09.  The Passenger replied, "Yeah, I mean I guess [I'm] going to press charges. . . .  That's what I was envisioning when I was under there, that the police were going to come and that she was going to be arrested."  Id. at 1:12:09-1:12:21.

Shortly thereafter, Trooper Hunter took Ms. Alberty into custody, see Bodycam Pt. I at 1:12:43-1:12:57, and read Ms. Alberty her Miranda Rights for the charges of reckless endangerment and breach of peace, id. at 1:14:09-1:14:43, before driving her to Troop C.

>    3.    Bus Station Footage

That same day, another trooper, Trooper Gonzalez, went to the Hartford bus station and viewed the video footage.  Pl.'s LR 56(a)2 Stmt. ¶ 38.

>        a)    Contents of the Footage

The video footage obtained from the bus station shows Ms. Alberty opening the luggage compartment for the Passenger, who began searching the compartment for her bag while Ms. Alberty held it open.  Bus Station Surveillance Footage ("Station Footage"), Defs.' Ex. D, at 3:50-3:54 (Doc. No. 80-6).  Within seconds, another male driver walked up to Ms. Alberty, and they put their arms around each other, talking closely such that Ms. Alberty's view of the luggage compartment was blocked by the male driver's head.  Id. at 4:01.  Ms. Alberty continued to hold the luggage compartment door open, and the Passenger entered the compartment.  Id. at 4:05.  At the end of their brief conversation, Ms. Alberty threw her head back and laughed.  Id. at 4:07. Immediately thereafter, the two separated, and Ms. Alberty closed the luggage compartment, waved the driver off, and boarded the bus.  Id. at 4:06-4:22.  The entire video sequence transpired over a period of seconds: the time stamp on the surveillance video indicates that the compartment was opened at 3:26:50 PM; the male bus driver blocked Ms. Alberty's view at 3:27:01 PM; the Passenger fully entered the compartment

SPA-008

at 3:27:05; Ms. Alberty laughed at 3:27:07; she closed the compartment at 3:27:11; and she boarded the bus at 3:27:21.  Id.

> b)      Defendants' Knowledge of the Footage

It does not appear, from the record, that any of the defendants personally viewed the bus station footage the day Ms. Alberty was arrested.  However, when Sergeant Samson was still on the scene, he received a call from Dispatch that a trooper from Troop H had located and viewed the footage.  See Deposition of Stephen J. Samson ("Samson Dep."), Pl.'s Ex. 2, at 139:22-140:10 (Doc. No. 86-3).

> Sergeant Samson:  Yes.
>
> Dispatcher:  Hey. . . . 593H was there, looked at the video and he says it appears to be accidental.
>
> Sergeant Samson:  Appears to be accidental.  Okay.  All right.
>
> Dispatcher:  I am like, you couldn't have told me that 30 seconds ago[.]
>
> Sergeant Samson:  Yeah, but her story doesn't make sense either out here.
>
> Dispatcher:  Okay.
>
> Sergeant Samson:  So –
>
> Dispatcher:  I am just letting you know, there is a video, like I said, there is a video, but – I think he's a new guy, isn't he?
>
> Sergeant Samson:  593?
>
> Dispatcher:  Yes[.]
>
> Sergeant Samson:  [. . .]  I can't remember who 593 is.
>
> Dispatcher:  Well – 593 –
>
> Sergeant Samson:  That is no problem.  We will get the video and we will – if they can burn that for a DVD for us and we will pick it up some time.
>
> Dispatch:  All righty. . . .

Audio Recording 191958 ("Audio Recording"), Pl.'s Ex. 8 (Doc. No. 86-9) (recording of phone call); accord Deposition of Robert A. Hunter ("Hunter Dep."), Pl.'s Ex. 3, at 255:14-256:11 (Doc. No. 86-4) (transcription of audio recording).

While processing Ms. Alberty back at Troop C, Trooper Hunter received a similar call from another officer, Trooper Blair:

> Trooper Hunter:  Hunter.
>
> Trooper Blair:  What's up.  Hey, listen, I just got off the phone with 593, Gonzalez, he is the new kid out of [Troop] H.  He went down there.  They are going to burn a hard copy for you.  He also gave them his e-mail, his state e-mail, because the girl that is down there doesn't know how to handle that, so she is going to forward it over to the security division on Monday.
>
> Trooper Hunter:  Okay.
>
> Trooper Blair:  But he did watch it and I said,  hey, what did you get, what did you see, I said, because I am not at the scene, but they got a 37.  He goes, he goes, dude, he goes, it clearly looks accidental.
>
> Trooper Hunter:  Okay.
>
> Trooper Blair:  Just a little heads up for you.  I don't know what you had out there, what statements led to the 37.  But he goes, yeah, I watched it and he goes, and it clearly looks accidental.  So I don't know.  So –
>
> Trooper Hunter:  All right.  That is what we have the other side of the system for.
>
> Trooper Blair:  Roger that.
>
> Trooper Hunter:  Okay.  Thanks, bye.

Hunter Dep. at 262:13-263:12 (transcription of audio recording); accord Bodycam Pt. I at 1:32:11-1:33:00 (Trooper Hunter taking call).  Trooper Hunter continued to process Ms. Alberty.  See Bodycam Pt. I at 1:33:00.

4.    Addition of the Unlawful Restraint Charge

Ms. Alberty was initially arrested on the Connecticut state charges of reckless endangerment in the second degree[4] and breach of peace in the second degree.[5]  Pl.'s LR 56(a)2 Stmt. ¶ 35.  At the police station, Ms. Alberty was given an opportunity to make a formal statement.  Hunter's Bodycam Footage Pt. II ("Bodycam Pt. II"), Pl.'s Ex. B, at 10:19 (Doc. No. 80-4).  After Ms. Alberty had been fingerprinted, Sergeant Samson stated, "We're going to ask you, if you'd like—you don't have to—to give a, basically a statement on what happened.  You don't have to give us a statement."  Id. at 10:20-10:26.  When Ms. Alberty expressed her desire to work with a lawyer first, Sergeant Samson responded, "[W]e have to – again, it's part of our procedure that we have to ask."  Id. at 11:02-11:06.  Ms. Alberty expressed her shock at the whole situation, and when she began to tear up, Sergeant Samson gave her a napkin from his desk and asked, "I'm going to have to ask you again, do you not want to make a statement?  It's your way of telling your side of the story."  Id. at 11:50-11:57.  Ms. Alberty, still tearful, reiterated that she was not interested, id. at 11:58, and Sergeant

---

[4] Reckless endangerment in the second degree is a Class B misdemeanor.  "A person is guilty of reckless endangerment in the second degree when [s]he recklessly engages in conduct which creates a risk of physical injury to another person."  Conn. Gen. Stat. § 53a-64.

[5] Breach of the peace in the second degree is a Class B misdemeanor.  A person is guilty of it when,

> with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do.

Conn. Gen. Stat. § 53a-181.  A "public place" is defined as "any area that is used or held out for use by the public whether owned or operated by public or private interests."  Id.

Samson confirmed one final time, "And so again, that's a no, right?  . . . We'll notate that in the report[.]"  Id. at 12:02-12:09.

During Ms. Alberty's processing, Sergeant Samson spoke with his supervisor, defendant Master Sergeant Deptula.  Pl.'s LR 56(a)2 Stmt. ¶¶ 40, 44.  Although Sergeant Samson recalled speaking with Master Sergeant Deptula in-person at the barracks, see Samson Dep. at 73:2-73:7, Master Sergeant Deptula testified that he was not at the barracks because he was only working on-call that day.  Declaration of Daniel Detula ("Deptula Decl."), Defs.' Ex. H, at ¶ 4 (Doc. No. 80-10).  Sergeant Samson spoke with Master Sergeant Deptula about the case in accordance with typical procedure, which was to report "unusual and potentially newsworthy" incidents "up the chain of command".  Id. at ¶ 6.  Although Sergeant Samson testified that he "may have" informed Master Sergeant Deptula that there was video of the incident at the bus station, both he and Master Sergeant Deptula testified that they do not recall Trooper Gonzalez's opinion of the video coming up during the discussion.  Id. at ¶ 11; Declaration of Stephen Samson ("Samson Decl."), Defs.' Ex. G, at ¶ 19 (Doc. No. 80-9).  Sergeant Samson further testified that he did not mention whether Ms. Alberty had given a formal statement.  Samson Decl. ¶ 19.  According to Master Sergeant Deptula, after hearing Sergeant Samson's summary of the incident, he "asked [Sergeant Samson] whether he felt [a charge of] unlawful restraint would also apply."  Deptula Decl. ¶ 8.[6]  After this conversation, Sergeant Samson "relayed to Trooper Hunter that

---

[6] In his testimony, Sergeant Samson provided a somewhat different account of the conversation, stating that Master Sergeant Deptula "advised [him] to add" the charge of unlawful restraint.  See Samson Dep. at 73:2-73:7.

the charge of [u]nlawful [r]estraint [in the first degree][7] should be added."  Samson Decl.

¶ 20.  According to Master Sergeant Deptula, he had no further involvement in Ms.

Alberty's state case.  Deptula Decl. ¶ 13.[8]

Ms. Alberty posted bond and was released that same day.[9]  Pl.'s LR 56(a)2 Stmt.

¶ 48.  Trooper Hunter "submitted his report to the State's Attorney's office, and his

report included the charge of unlawful restraint and identified that the bus station

surveillance footage existed."  Id. at ¶ 49; see also Prosecutor's File at 3, 6.[10]  The

report prepared by Trooper Hunter advised that, "[u]pon receipt of the [bus station]

surveillance footage[, a copy] will be entered into evidence [and] a supplemental report

will be submitted[,]" Prosecutor's File at 6, though it is unclear from the record whether a

supplemental report was actually submitted.  The report also provided a summary of

Ms. Alberty's version of events:

> While on scene this Trooper spoke with [Ms.] Alberty and she verbally
> explained that she had started driving the bus in New York.  She stated that
> they stopped at Union Station in Hartford to change bus drivers.  She had
> made an announcement to the passengers that this was not a scheduled
> rest stop and that if passengers were to get off the bus and not be back in
> time to leave they would be left.  She then stated that one of the passengers
> requested to use the restroom inside the terminal.  She explained that she
> allowed him to do so and took his information should the bus leave him

---

[7] In Connecticut, unlawful restraint is a Class D felony, and "[a] person is guilty of unlawful restraint in the first degree when [s]he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."  Conn. Gen. Stat. § 53a-95.

[8] Alberty denies this statement of fact, but she does not provide any citation to support her denial. See Pl.'s LR 56(a)2 Stmt. ¶ 47.  Accordingly, the court deems this fact admitted.  See D. Conn. L. Civ. R. 56(a)3 ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to [the record].  . . .  Failure to provide specific citations to evidence in the record . . . may result in the Court deeming admitted certain facts that are supported by the evidence. . . .").

[9] Ms. Alberty's bail, which was originally set at $2,000 cash or surety, was not increased with the addition of the unlawful restraint charge.  Pl.'s LR 56(a)2 Stmt. ¶ 46.

[10] Although the plaintiff denies this fact, see Pl.'s LR 56(a)2 Stmt. ¶ 49, it is clearly supported by the Prosecutor's File, see Prosecutor's File at 3-6.

behind.  She was then approached by [the Passenger] who ask[ed] her if she could retrieve items from her bag inside the luggage compartment.  She stated that she opened the compartment for her.  [Ms.] Alberty then demonstrated to this Trooper how she would have to install the safety latch on the door so that it would not close on its own.  She stated that once she opened the door for [the Passenger] she walked away from the bus and no longer could see the female passenger.  She stated that she did not know she had climbed into the luggage compartment, and when the relieving bus driver arrived he entered the bus to begin his pre trip checks as she closed the luggage compartment.  She stated that she did not see [the Passenger] inside nor did she hear her make any noise.  [Ms.] Alberty stated that she then went back onto the bus to take her seat to continue the trip to Boston where she would then drive the bus back to New York.

Id. at 5-6.

The prosecutor's notes of the events in Ms. Alberty's corresponding criminal case reflect that, on September 5, 2019, Ms. Alberty's attorney "[i]ndicated that the comment of 'have a good ride' was from [the] male driver [that Ms. Alberty] was speaking with." Id. at 2.  On September 26, Ms. Alberty's counsel "[r]equested video from [the] bus transfer", and on December 15, 2019, Ms. Alberty's case received a nolle prosequi ("nolle").[11] Id.

B.    Procedural Background

Ms. Alberty initiated the instant case against Trooper Hunter and Sergeant Samson on July 20, 2020, see Complaint (Doc. No. 1), and amended her Complaint to add Master Sergeant Deptula as a defendant on May 10, 2022, see Am. Compl. Having sued all the defendants in their individual capacities, Ms. Alberty alleges that her

---

[11] "A nolle prosequi is a unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy. . . . Under Connecticut law, a nolle prosequi terminates the prosecution, but the prosecuting authority is permitted to initiate a new action against the defendant within the statute of limitations. . . . A nolle prosequi may not be entered if the accused objects and demands either a trial or dismissal. . . . Criminal charges that have been nolled are erased thirteen months after entry of the nolle prosequi."  Roberts v. Babkiewicz, 582 F.3d 418, 420 (2d Cir. 2009) (internal quotation marks and citations omitted).

constitutional rights under the First, Fourth, and Fourteenth Amendments were violated

by the defendants' conduct.  Count One of the Amended Complaint alleges that the

defendants deprived Ms. Alberty of her right to be free from unreasonable searches and

seizures, in violation of section 1983.  See Am. Compl. at ¶¶ 37-39.  Count Two alleges

false arrest and/or false imprisonment, id. at ¶¶ 40-46, while Count Three alleges

malicious prosecution, id. at ¶¶ 47-52.  Finally, Count Four alleges retaliatory

prosecution.  Id. at ¶¶ 43-58.

On December 24, 2022, the defendants moved for summary judgment.  See

Defs.' Mot.  Ms. Alberty opposes the Motion.  See Pl.'s Opp.

## III.  LEGAL STANDARD

A motion for summary judgment may be granted only where the moving party

can establish that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64,

71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party

must set forth specific facts demonstrating that there is indeed "a genuine issue for

trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir.

2016).  Unsupported allegations do not create a material issue of fact and cannot

overcome a properly supported motion for summary judgment.  See Weinstock v.

Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine

whether there are disputed issues of material fact, the trial court must "resolve all

ambiguities and draw all inferences in favor of the party against whom summary

judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir.

1995).

## IV.  DISCUSSION

The defendants argue that "all of [Ms. Alberty]'s claims, whether brought

pursuant to state law or federal law, fail because probable cause existed to arrest [her]",

and there is "no evidence of malice or retaliatory intent, let alone any causal connection

between any alleged protected conduct and the addition of the [unlawful restraint]

charge."  Defendants' Memorandum of Law in Support of Motion for Summary

Judgment ("Defs.' Mem.") at 9-10 (Doc. No. 80-1).  Defendants also argue that, even if

probable cause to arrest and charge Alberty was lacking, arguable probable cause

existed, and they are therefore entitled to qualified immunity.  Id. at 28.

A.    Count Two: False Arrest/False Imprisonment[12]

The Second Circuit has instructed that courts should "generally look[ ] to the law

of the state in which the arrest occurred" to determine the elements of claims for false

arrest, in violation of the Fourth Amendment, brought under section 1983.  See Davis v.

Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004).  To prevail on a claim of false arrest under

Connecticut law, a plaintiff must establish that (1) the defendant intentionally arrested

her or had her arrested; (2) the plaintiff was aware of the arrest; (3) the plaintiff did not

---

[12] It is not clear from the face of the Second Amended Complaint or from Ms. Alberty's Opposition
Memoranda whether Ms. Alberty alleges her claims of false arrest and malicious prosecution under
section 1983 or solely under Connecticut tort law.  However, the court's decision is the same under either
view of these claims because the presence of probable cause is a pivotal component to both.  See
Nodoushani v. S. Conn. St. Univ., 152 Conn. App. 84, 91-92 (2014) ("[O]ur substantive analysis of the
false arrest and malicious prosecution claims is virtually identical under § 1983 and the common law.").

SPA-016

consent to the arrest; and (4) the arrest was not supported by probable cause.  See

Conroy v. Caron, 275 F. Supp. 3d 328, 348 (D. Conn. 2017).  Accordingly, "a false

arrest claim cannot lie when the challenged arrest was supported by probable cause."

Russo v. City of Bridgeport, 479 F.3d 196, 203-204 (2d Cir. 2007).  Under "both federal

and Connecticut law, probable cause to arrest exists when police officers have

knowledge or reasonably trustworthy information of facts and circumstances that are

sufficient to warrant a person of reasonable caution in the belief that the person to be

arrested has committed or is committing a crime." Zalaski v. City of Hartford, 723 F.3d

382, 389-90 (2d Cir. 2013) (internal quotation marks and citation omitted).  The

Supreme Court has emphasized that "[f]inely tuned standards," such as proof beyond a

reasonable doubt or by a preponderance of the evidence, have no place in determining

probable cause; rather, all that is required is "the kind of 'fair probability' on which

reasonable and prudent people, not legal technicians, act."  Florida v. Harris, 568 U.S.

237, 243-44 (2013) (citing Illinois v. Gates. 462 U.S. 213, 231-38 (2013)).  Moreover, in

Connecticut, the applicable law for false imprisonment claims and false arrest claims is

identical.  See Marchand v. Hartman, 395 F. Supp. 3d 202, 216 (D. Conn. 2019).  As

such, the existence of probable cause to arrest also defeats a claim of false

imprisonment.  See id.

    In the false arrest context, the existence of probable cause depends upon

whether the facts known by the arresting officer at the time of the arrest objectively

provided probable cause to arrest.  See Washington v. Dewey, 433 F. Supp. 3d 334,

346 (D. Conn. 2020).  "[I]t is well-established that a law enforcement official has

probable cause to arrest if he received his information from some person, normally the

putative victim or eyewitness." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000)

(citing Miloslavsky v. AES Eng'g Soc'y, Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992)).

Absent circumstances raising doubts about the victim's veracity, "a victim's identification

is typically sufficient to provide probable cause." Stansbury v. Wertman, 721 F.3d 84,

90 (2d Cir. 2013). Moreover, the Second Circuit has held that "a claim for false arrest

turns only on whether probable cause existed to arrest a defendant, and that it is not

relevant whether probable cause existed with respect to each individual charge". See

Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

Thus, the court must determine whether the defendants had probable cause to

believe that Ms. Alberty had committed a crime at the time of her arrest. Ms. Alberty

was initially arrested for reckless endangerment and breach of the peace. Pl.'s LR

56(a)2 Stmt. ¶ 35. Under Connecticut law, "[a] person is guilty of reckless

endangerment in the second degree when [s]he recklessly engages in conduct which

creates a risk of physical injury to another person." Conn. Gen. Stat. § 53a-64. A

person acts "recklessly" when she "is aware of and consciously disregards a substantial

and unjustifiable risk". See id. § 53a–3(13).

Here, it is undisputed that, prior to Ms. Alberty's arrest, the defendants knew that

a 911 call was made by someone claiming to be in the luggage compartment of a Peter

Pan bus, and when Trooper Hunter pulled the bus over and had the luggage

compartment opened, the Passenger emerged. Pl.'s LR 56(a)2 Stmt. ¶¶ 1, 8, 18. The

Passenger informed Trooper Hunter that Ms. Alberty had seen her enter the

compartment, and that Ms. Alberty had "laughed and shut the door". Id. at ¶¶ 24–25.

Trooper Kaelberer felt that the Passenger had "no reason to lie about that", see

SPA-018

Bodycam Pt. I at 10:12-10:26, and the defendants were within their discretion to credit the Passenger's claim, see Stansbury, 721 F.3d at 90-91. Trooper Hunter also took a statement from Mr. Jeanbaptiste, who told them that Peter Pan's company policy forbade drivers from letting passengers into the compartments, and it was Ms. Alberty's responsibility to secure the compartments before the bus departed.[13] Prosecutor's File at 17. This information, taken together, is sufficient to establish probable cause that Ms. Alberty committed reckless endangerment. No reasonable juror could find that there was not a "fair probability"— based on the totality of the circumstances—that Ms. Alberty had committed reckless endangerment by opening the compartment and enabling, intentionally or not, the Passenger to enter, and closing it without verifying that the compartment was devoid of riders.

Similarly, based on the undisputed facts, the defendants also had probable cause to believe that Ms. Alberty had committed breach of the peace in the second degree. This charge applies when a person either "with intent to cause inconvenience, annoyance, or harm, or recklessly creating a risk thereof, . . . [inter alia,] creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do." Conn. Gen. Stat. § 53a-181 (emphasis added). At the

---

[13] Ms. Alberty claims that there is a material issue of fact over the Peter Pan company policy because she "credibly testified that it was her understanding that she was not required to examine the bus's luggage bays prior to boarding the bus as a passenger." Pl.'s Mem. at 26. Ms. Alberty's beliefs about company policy, however, are immaterial to the probable cause analysis. The existence of probable cause is made in light of the "facts known by the arresting officer at the time of the arrest." Dewey, 433 F. Supp. 3d at 346 (emphasis added).

At the time of the arrest, the defendants had reason to believe, because of Mr. Jeanbaptiste's statement, that Ms. Alberty had violated her company's safety protocols. Ms. Alberty has come forward with no evidence suggesting that the defendants had any reason to doubt Mr. Jeanbaptiste's characterization of Peter Pan company policy.

time of the arrest, the defendants had sufficient information to believe that, by locking

the Passenger in the luggage compartment of a moving bus, Ms. Alberty had "recklessly

create[ed]" a "public and hazardous or physically offensive condition".  Id.

Ms. Alberty contends that probable cause was lacking because, "at the time that

Ms. Alberty was placed under arrest, Defendant[s] Hunter and Samson were aware of a

crucial piece of exculpatory evidence"—i.e., the surveillance footage—"that should have

at the very least provided them the opportunity to test the statements of both the

Passenger and Ms. Alberty."  Pl.'s Mem. at 11.[14]  However, the defendants' awareness

that the footage existed does not defeat probable cause.  Both Trooper Hunter and

Sergeant Samson have denied that they were aware of the footage's contents—

including Trooper Gonzalez's opinion that the incident "appear[ed] accidental", see

Audio Recording —until after Ms. Alberty was arrested.  See Samson Decl. ¶ 16;

Declaration of Robert Hunter ("Hunter Decl."), Def.'s Ex. F, at ¶ 25 (Doc. No. 80-8).  Ms.

Alberty has not provided any evidence to dispute or question their testimony.[15]  The

---

[14] In her Opposition Memorandum, Ms. Alberty goes one step further and argues that the defendants "intentionally concealed exculpatory evidence from the prosecuting attorney" by failing to include the bus station footage and Trooper Gonzalez's opinion of it to the prosecutor.  Pl.'s Mem. at 18.  However, the police report included in the prosecutor's materials, provided by the defendants, states that the surveillance footage existed.  See Prosecutor's File at 6 ("While on scene, [Trooper Hunter] requested that Troop H assist in this investigation by obtaining video surveillance footage taken from the . . . [bus s]tation. . . .  [Trooper] Gonzalez . . . viewed the footage and requested that a hard copy be made.").  The police report also included a detailed description of Ms. Alberty's statements at the scene.  See Section II.D, supra.

No reasonable juror could conclude, from the facts before the court, that the defendants concealed the video, or presented the facts of the case in such a way as to steer the prosecutor away from the salient facts pertaining to Ms. Alberty's charges.

[15] Ms. Alberty appears to contest Sergeant Samson's assertion that he did not learn about Trooper Gonzalez's opinion until after she was arrested.  See Pl.'s LR 56(a)2(ii) Stmt. ¶ 39.  However, none of the evidence cited by Ms. Alberty disputes or contradicts Sergeant Samson's testimony.  It merely shows that Trooper Hunter and Sergeant Samson were aware that footage existed prior to Ms. Alberty's arrest, see Bodycam Pt. 1 at 10:30-10:40, and that Sergeant Samson learned about Trooper Gonzalez's opinion while he was still "at the scene", see Samson Dep. at 139:22-140:10.  This evidence

defendants were "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Ricciuti v. N.Y. City Trans. Auth., 124 F.3d 123,128 (2d Cir. 1997). Indeed, "courts in this Circuit have expressly held that police do not have to review surveillance video in order to establish probable cause." Walston v. City of New York, 289 F. Supp. 3d 398, 414 (E.D.N.Y. 2018), aff'd, 754 F. App'x 65 (2d Cir. 2019) (citing Wieder v. City of New York, No. 09–CV–3914, 2013 WL 1810751, at *10-11 (E.D.N.Y. Apr. 29, 2013)). Based on the record before the court, the defendants' knowledge of the surveillance footage at the time of the arrest did not obviate the existence of probable cause.

Based on the available and undisputed facts, no reasonable juror could find that the officers lacked probable cause to arrest Ms. Alberty for both reckless endangerment in the second degree and breach of the peace in the second degree. Ms. Alberty's false arrest and/or false imprisonment claim therefore fails as a matter of law, and the court grants the defendants' Motion for Summary Judgment as to Count Two.[16]

B.    Count Three: Malicious Prosecution

Under Connecticut law, a plaintiff is required to prove four elements to sustain an action for malicious prosecution: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated

---

is consistent with Sergeant Samson's testimony. See Samson Decl. ¶ 16 ("After Ms. Alberty had been placed in custody by Trooper Hunter and en route to Troop C, it was relayed to me that Trooper Gonzalez . . . viewed video of the incident . . . [and] opined that it appeared accidental.").

Moreover, even assuming that Sergeant Samson had learned about Trooper Gonzalez's opinion on the footage prior to Ms. Alberty's arrest, the defendants would still have had, at least, arguable probable cause to arrest Ms. Alberty. See Section IV.B, infra. As such, it does not constitute a dispute of material fact sufficient to defeat summary judgment.

[16] The court also notes that summary judgment as to Count Two is even more clearly warranted for Master Sergeant Deptula because there is no evidence in the record that he was present for or involved in Ms. Alberty's arrest.

SPA-021

in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the

defendant acted with malice".  McHale v. W.B.S. Corp., 187 Conn. 444, 447 (1982).

The parties do not dispute that Ms. Alberty has met the first two elements.[17]  The

defendants argue, however, that Ms. Alberty's claim of malicious prosecution fails as a

matter of law because they had probable cause and lacked malice.  Defs.' Mem. at 27–

28.

"Probable cause, in the context of malicious prosecution, has . . . been described

as such facts and circumstances as would lead a reasonably prudent person to believe

the plaintiff guilty."  Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003).  The

Second Circuit has described the probable cause standard in the malicious prosecution

context as "slightly higher than the standard for false arrest cases."  See Stansbury, 721

F.3d at 95.  The "[d]etermination of probable cause . . . must be evaluated in light of the

facts known or believed at the time the prosecution is initiated, rather than at the time of

the arrest."  Lovelace v. City of New York, No. 02-CV-5398, 2005 WL 552387, at *2

(E.D.N.Y. Mar. 9, 2005).  Probable cause for an arrest is generally a "complete defense

to a claim of malicious prosecution", unless "exculpatory facts" become known after the

arrest.  D'Angelo v. Kirschner, 288 F. App'x 724, 726 (2d Cir. 2008).  An officer may not

disregard "plainly exculpatory" evidence.  See Panetta v. Crowley, 460 F.3d 388, 395

---

[17] The defendants do not dispute that they "initiated or procured the institution of" the criminal charges against Ms. Alberty, see Hunter Decl. ¶¶ 24-27; Samson Decl. ¶¶ 15-20; Deptula Decl. ¶¶ 5-8. Nor do they dispute that the nolle prosequi constituted a favorable termination of Ms. Alberty's criminal case.  Indeed, the Second Circuit has made clear that the entry of a nolle prosequi meets the favorable termination requirement "if the abandonment of the prosecution was not based on an arrangement with the defendant."  See Conquistador v. Zweibelson, 851 Fed. App'x 256, 258 (2d Cir. 2021).  Because the nolle in Ms. Alberty's criminal case does not appear to have been entered pursuant to any agreement between Ms. Alberty and the government, see Prosecutor's File at 2, the favorable termination requirement has been met.

(2d Cir. 2006).  Importantly, "a finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges". D'Angelo, 288 F. App'x at 726.   Moreover, the Second Circuit has held that "[a] lack of probable cause generally creates an inference of malice".  See Boyd, 336 F.3d at 78.

       1.     Reckless Endangerment and Breach of the Peace Charges

Both Trooper Hunter and Sergeant Samson were involved in Ms. Alberty's processing for the reckless endangerment and breach of the peace charges.  See Hunter Decl. ¶¶ 25-27; Samson Decl. ¶¶ 19-20; Bodycam Pt. 1.  The two also discussed these charges with Master Sergeant Deptula, Sergeant Samson's supervisor.  See Pl.'s LR 56(a)2 Stmt. ¶¶ 40-45; Deptula Decl. ¶ 8.  As noted above, both statutes require recklessness, see Conn. Gen. Stat. §§ 53a-64, 53a-181—that is, "aware[ness] of and conscious[ ] disregard[ of] a substantial and unjustifiable risk", id. § 53a–3(13).

       a)     Probable Cause

It is undisputed that, before Ms. Alberty's processing was complete, both Sergeant Samson and Trooper Hunter became aware of Trooper Gonzalez's opinion that the surveillance footage indicated that the incident was accidental.  See Audio Recording (dispatcher informing Sergeant Samson of Trooper Gonzalez's opinion that the incident "appears to be accidental"); Hunter Dep. at 262:13-263:12 (transcription of call informing Trooper Hunter of Trooper Gonzalez's opinion that the incident "clearly looks accidental").  Thus, by the time the prosecution was initiated, both Trooper Hunter and Sergeant Samson were aware of information suggesting that Ms. Alberty's conduct was an accident, rather than a conscious disregard of a known risk.  See Voisine v. United States, 579 U.S. 686, 694 (distinguishing "recklessness" from "accident" and

noting that recklessness entails "a deliberate decision to endanger another"). Despite their awareness of this potentially "exculpatory fact[ ]", see D'Angelo, 288 F. App'x at 726, both officers opted not to review the footage and continued to process and charge Ms. Alberty, see Audio Recording (recording of Sergeant Samson learning about Trooper Gonzalez's opinion that the incident "appear[ed] accidental" and responding that Ms. Alberty's story still "doesn't make sense"); Bodycam Pt. I at 1:33:00 (recording of Trooper Hunter learning about Trooper Gonzalez's opinion that the incident "clearly looks accidental" and responding "[t]hat is what we have the other side of the system for").

An officer's "failure to make further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)). Here, Trooper Gonzalez's opinion on the footage was an important piece of information that called into question whether Ms. Alberty was, in fact, guilty of reckless endangerment and breach of the peace. Indeed, both Sergeant Samson and Trooper Hunter recognized the potential importance of the footage and what it might show—while on the scene, Sergeant Samson asked Trooper Hunter to get someone from Troop H to "find out about the video", Bodycam Pt. 1 at 13:01-13:09, and Trooper Hunter relayed the request to Dispatch, id. at 16:25-17:00. A reasonable juror could conclude that it was unreasonable for the defendants, after hearing Trooper Gonzalez's opinion, to continue processing Ms. Alberty without looking further into the potentially exculpatory footage. As such, the court cannot conclude that the defendants had probable cause for both charges by the time of Ms. Alberty's processing.

b)      Arguable Probable Cause

However, the court's assessment of the defendants' liability does not end at actual probable cause.  The defendants may still be entitled to qualified immunity, which shields government officials from civil damages liability unless the officials violated a clearly established constitutional or statutory right.  Bacon v. Phelps, 961 F.3d 533, 542 (2d Cir. 2020).  Freedom from malicious prosecution "is a constitutional right that has long been clearly established."  Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003).  However, "an officer is entitled to qualified immunity from a claim for . . . malicious prosecution if he or she had at least arguable probable cause to have . . . initiated and maintained a prosecution."  Conroy, 275 F. Supp. 3d at 349.  Arguable probable cause is met if either (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met."  Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).  The Second Circuit has emphasized,

> When a plaintiff alleges that a law enforcement officer's official conduct renders him personally liable in damages, our inquiry is not whether the officer should have acted as he did.  Nor is it whether a singular, hypothetical entity exemplifying the "reasonable officer"—a creature akin to the "reasonable man" of the law of torts . . . —would have acted in the same way.  It is instead whether any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that [probable cause existed].

Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016).

As discussed above, Trooper Hunter and Sergeant Samson had sufficient information, at the time of the arrest, to believe that Ms. Alberty had committed reckless endangerment in the second degree and breach of the peace in the second degree. The only change in the information available to Trooper Hunter and Sergeant Samson

between the arrest and the initiation of the prosecution appears to have been Trooper

Gonzalez's opinion, based on the footage, that the incident was accidental.  The

Second Circuit has noted that police officers should be afforded substantial latitude

when determining probable cause in the context of <u>mens rea</u> crimes.  <u>See</u> <u>Zalaski v.

City of Hartford</u>, 723 F.3d 382, 393 (2d Cir. 2013).  Indeed, Trooper Hunter and

Sergeant Samson had other reasons to believe Ms. Alberty had, at the very least, acted

recklessly, including the Passenger's statements and Mr. Jeanbaptiste's statement

suggesting that Ms. Alberty violated her company's safety standards.  The court finds

that a reasonable officer could have concluded, based on the available information, that

there was probable cause to charge Ms. Alberty with reckless endangerment in the

second degree and breach of the peace in the second degree. The defendants are

therefore entitled to qualified immunity with respect to Count Three's claim of malicious

prosecution for the charges of reckless endangerment and breach of the peace.[18]

### 2.    Unlawful Restraint Charge

It is undisputed that, before Ms. Alberty was fully processed, the defendants

decided to add a third charge of unlawful restraint.  <u>See</u> Hunter Decl. ¶ 27; Samson

Decl. ¶ 20; Deptula Decl. ¶¶ 8-9.  Unlike reckless endangerment and breach of the

peace, unlawful restraint requires intent: the "element [of unlawful restraint] requires

proof not only that the defendant actually restricted the complainant's movements in

such a manner as to interfere substantially with her liberty, without her consent, but that

---

[18] The court notes that summary judgment is even more clearly warranted for Master Sergeant Deptula because there is no evidence in the record indicating that he was aware of Trooper Gonzalez's opinion that the incident appeared to be accidental.

[s]he did so intentionally, that is, with the 'conscious objective' of causing that result."

State v. Tony O., 211 Conn. App. 496, 516 (2022), cert. denied, 343 Conn. 921 (2022).

### a)    Sergeant Samson and Trooper Hunter

#### (1)    Probable Cause

Both Sergeant Samson and Trooper Hunter were aware of Trooper Gonzalez's opinion that the incident appeared to be accidental before they added the charge of unlawful restraint.  See Hunter Dep. at 265:17-266:2; Samson Decl. ¶¶ 16-19.[19] Nevertheless, even with this information, Sergeant Samson and Trooper Hunter charged Ms. Alberty with a crime that requires intent, without inquiring further into the footage.  Thus, a reasonable juror could conclude that Sergeant Samson and Trooper Hunter did not have probable cause to charge Ms. Alberty with unlawful restraint.

#### (2)    Arguable Probable Cause

Trooper Hunter and Sergeant Samson contend that they are entitled to qualified immunity because, at the very least, arguable probable cause existed to add the unlawful restraint charge.  Defs.' Mem. at 33-34.  As discussed above, arguable probable cause, and therefore qualified immunity, is warranted if officers of reasonable competence could disagree on whether the probable cause test was met.  See Mazza,

---

[19] The defendants have provided somewhat conflicting testimony as to who made the final decision to charge Ms. Alberty with unlawful restraint.  Sergeant Samson testified that Master Sergeant Deptula "advised [him] to add" the charge of unlawful restraint, see Samson Dep. at 73:2-73:7, while Master Sergeant Deptula testified that he merely suggested the charge be added, and that Sergeant Samson was the final decisionmaker as to whether to add the charge, see Deptula Dep. at 38:16-39:23.

Regardless of this apparent discrepancy, the record makes clear that Sergeant Samson and Trooper Hunter were both involved in the addition of the unlawful restraint charge.  Sergeant Samson testified that he technically had final decision-making authority over what charges to levy against Ms. Alberty.  See Samson Dep. at 72:8-72:18.  Sergeant Samson further testified that he relayed the additional charge to Trooper Hunter, who added it to Ms. Alberty's Notice of Rights form, id. at 76:16-76:22; Hunter Decl. ¶ 27, and Sergeant Samson also testified that Trooper Hunter had some input over what charges to levy against Ms. Alberty.  See Samson Dep. at 69:10-69:13, 72:3-72:7.

825 F.3d at 100 .  It is a forgiving standard that "protects all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

Based on the undisputed facts, the court cannot conclude that, in adding the charge of unlawful restraint, Trooper Hunter and Sergeant Samson were "plainly incompetent" or "knowingly violat[ing] the law."  Id. at 341.  At the time, both defendants had some basis to believe that Ms. Alberty may have intentionally locked the Passenger in the luggage compartment.  The Passenger was found in the compartment, see Bodycam Pt. 1 at 6:35, and she repeatedly and adamantly told the defendants that Ms. Alberty saw her in the compartment, laughed at her, and shut the door, see id. at 7:21-7:25.  The Passenger then repeated these allegations in her statement to the police. See Prosecutor's File at 16.  Moreover, the information that both defendants had regarding the footage—namely, Trooper Gonzalez's opinion that it showed the incident was accidental—was not "plainly exculpatory".  See Panetta, 460 F.3d at 395.  It was the opinion of a single officer—an opinion that was transmitted to Trooper Hunter and Sergeant Samson not by Trooper Gonzalez himself, but by intermediaries.  And, although the footage itself, in the view of this court, constituted compelling evidence that Ms. Alberty was not guilty of unlawful restraint,[20] the court cannot conclude that it was "plainly exculpatory".  The video lacks sound, and it shows Ms. Alberty opening the compartment for the Passenger, laughing, and closing the door while the Passenger is inside, all within a matter of seconds.  See Station Footage at 3:58-4:13.  It is not so

---

[20] As discussed above, the bus station footage appears to show a male driver blocking Ms. Alberty's view during the pivotal moment in which the Passenger climbed into the luggage compartment. See Station Footage at 4:01-4:05.

SPA-028

conclusive that "no reasonable officer" could view the footage, in combination with the Passenger's statement, and find Ms. Alberty's conduct potentially intentional.

Trooper Hunter and Sergeant Samson were wrong, in this court's view, to add the charge of unlawful restraint, given the information known to them at the time, without at least inquiring further into the footage. Overcoming the forgiving standard of qualified immunity, however, requires more. Because Trooper Hunter and Sergeant Samson's conduct was not "so flawed that no reasonable officer would have made a similar choice", see Lennon v. Miller, 66 F.3d 416, 424-25 (2d Cir. 1995), the court finds that they are entitled to qualified immunity with respect to Count Three's claim of malicious prosecution for the charge of unlawful restraint. The court therefore grants defendants' Motion as to Count Three with respect to Trooper Hunter and Sergeant Samson.

b)   Master Sergeant Deptula

Ms. Alberty seeks to hold Master Sergeant Deptula liable for the addition of the unlawful restraint charge. Am. Compl. at ¶¶ 31, 47-52. However, both Sergeant Samson and Master Sergeant Deptula have testified that they do not believe that, during their conversation, Sergeant Samson informed Master Sergeant Deptula of Trooper Gonzalez's opinion that the incident appeared accidental. Samson Decl. ¶ 19; Deptula Decl. ¶ 9. Ms. Alberty does not point to any evidence in the record suggesting that Master Sergeant Deptula was ever made aware of Trooper Gonzalez's opinion before Deptula recommended that the charge of unlawful restraint be added. Rather, Master Sergeant Deptula has testified that he was aware of other circumstances suggesting that Ms. Alberty may have acted intentionally, including the Passenger's statement that Ms. Alberty closed the door and "made [the] comment [of], '[Have] a nice

ride'", which was relayed to him by Sergeant Samson.[21]  See Deposition of Daniel W. Deptula ("Deptula Dep."), Pl.'s Ex. 5, at 38:25-39:6 (86-5).  Based on the information available to him at the time, Master Sergeant Deptula had reason to believe that Ms. Alberty was guilty of unlawful restraint.  Moreover, even if Master Sergeant Deptula had known about Trooper Gonzalez's opinion during his phone call with Sergeant Samson, he would still be entitled to qualified immunity for the same reasons as Trooper Hunter and Sergeant Samson.  The court thus grants defendants' Motion as to Count Three with respect to Master Sergeant Deptula.

　　　C.　　Count Four: Retaliatory Prosecution

　　　Ms. Alberty alleges that, "[a]s a direct result of Ms. Alberty's exercise of her Constitutional right to refrain from speech" by declining to provide a formal statement, the defendants charged her with unlawful restraint, "despite their knowledge that there was no probable cause to support [the] charge[.]"  Am. Compl. ¶¶ 54–55.  To survive a motion for summary judgment, a plaintiff must proffer evidence to show that "(1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by h[er] exercise of that right; and (3) the defendant's actions caused h[er] some injury."  Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir. 2013).  Importantly, the Supreme Court has established that a plaintiff must also show that the defendants lacked probable cause to bring the charge.  See Hartman v. Moore, 547 U.S. 250, 265 (2006).

---

　　　[21] The Passenger actually stated that Ms. Alberty locked her in the compartment and said, "Ha! [E]njoy the ride", rather than, "Have a nice ride".  See Prosecutor's File at 16.

Here, the court has determined that the defendants had arguable probable cause to add the unlawful restraint charge.  See Section IV.B.2, supra.  Courts in this Circuit have held that, in the context of First Amendment retaliation, including retaliatory prosecution, the existence of arguable probable cause is sufficient to entitle an officer to qualified immunity.  See, e.g., Pinto v. City of New York, 728 Fed. App'x 26, 31 (2d Cir. 2018) (summary order) (holding that "[t]he existence of arguable probable cause entitles [the defendant officer] to qualified immunity on [the plaintiff's section]1983 claims for . . . First Amendment retaliation . . . ."); Burdick v. Swarts, No. 5:12-CV-1711, 2019 WL 1409938, at *10 (N.D.N.Y. Mar. 28, 2019) (finding that a defendant officer was entitled to qualified immunity on plaintiff's retaliatory prosecution claim because the defendant had arguable probable cause to charge the plaintiff); Smith v. Town of Lewiston, No. 17-CV-959, 2022 WL 3273241, at *12 (W.D.N.Y. Aug. 11, 2022) (noting that the plaintiff's retaliatory prosecution claim "likely will turn on whether the prosecution was supported by probable cause or arguable probable cause"); Vidal v. Valentin, No. 16-CV-5745, 2019 WL 3219442, at *10 (S.D.N.Y. July 17. 2019) ("[W]here retaliation is alleged . . . if 'arguable probable cause' is shown, the defendant is entitled to qualified immunity.").  As such, the defendants are entitled to qualified immunity with respect to Ms. Alberty's retaliatory prosecution claim, and the court need not consider whether Ms. Alberty has met the other three elements of retaliatory prosecution.

Ms. Alberty contends that "there are significant questions of fact surrounding the defendants' decision to add [unlawful restraint] to her charges."  Pl.'s Opp. at 27.  She points to (1) the confusion over whether Master Sergeant Deptula was at Troop C when he suggested the addition of the charge, and (2) the ambiguity over whether Master

Sergeant Deptula suggested or directed that the charge be added.  Id. at 27-28.

Neither of these ambiguities raise an issue of material fact.  Whether Master Sergeant

Deptula was present in barracks or reporting from home when he spoke with Sergeant

Samson is immaterial to the question of whether arguable probable cause existed as to

the charge of unlawful restraint.  Nor does it matter whether the addition of the unlawful

restraint charge was at the direction of Master Sergeant Deptula, or whether it was

added at his suggestion.  Under either scenario, there was arguable probable cause to

add it.  See Section IV.B.2.a, supra.

Because arguable probable cause existed to add the unlawful restraint charge,

the defendants are entitled to qualified immunity with respect to plaintiff's retaliatory

prosecution claim.  The court therefore grants the defendants' Motion as to Count Four.

D.     Count One: Unreasonable Search and Seizure

Finally, Count One of Ms. Alberty's Amended Complaint alleges "violation of 42

U.S.C. § 1983", specifically Ms. Alberty's "right to be free from unreasonable searches

and seizures as protected by the Fourth and Fourteenth Amendments".  Am. Compl. at

¶ 37.  It is unclear, from the face of the Complaint, whether Count One is separate and

distinct from Ms. Alberty's false arrest and malicious prosecution claims in Counts Two

and Three.  It is well-established that "Section 1983 claims for false arrest and malicious

prosecution are based on th[e] Fourth Amendment right to be free from unreasonable

seizures, including arrest and prosecution without probable cause."  Chase v. Nodine's

Smokehouse, Inc., 360 F. Supp. 3d 98, 111 (D. Conn. 2019).  Indeed, Ms. Alberty's

Amended Complaint specifies that her lawsuit is "brought pursuant to 42 U.S.C. § 1983,

the First, Fourth and Fourteenth Amendments . . . and the common law of Connecticut

Case: 23-7564, 03/01/2024, DktEntry: 23.1, Page 74 of 76
Case 3:20-cv-01014-JCH  Document 94  Filed 09/26/23  Page 32 of 33

SPA-032

sounding in tort to redress the <u>unlawful wrongful arrest, malicious prosecution, and</u> <u>retaliatory prosecution</u> of Plaintiff on the part of the Defendants, acting under color of law."  Am. Compl. at ¶ 1 (emphasis added).  Thus, it does not appear that Ms. Alberty is alleging any additional theories of liability, beyond her claims of false arrest, malicious prosecution, and retaliatory prosecution.  Nor does Ms. Alberty's Amended Complaint detail, even cursorily, any conduct by defendants that could form the basis of an unreasonable search and seizure claim separate and distinct from her false arrest and malicious prosecution claims.[22]

In any event, the court finds that the defendants are entitled to qualified immunity with respect to this claim because there was, at least, arguable probable cause to arrest and charge Ms. Alberty.  Courts in this Circuit have held that, where there is probable cause to arrest, searches incidental to that arrest are generally lawful.  <u>See, e.g.</u>, <u>Walker v. City of New York</u>, No. 15-CV-500, 2017 WL 2799159, at *6 (E.D.N.Y. June 27, 2017) (finding that, "[b]ecause there was probable cause for plaintiff's arrest, the [officer's] search of [the plaintiff's] person was lawful"); <u>Serrano v. City of New York</u>, No. 16-CV-8105, 2018 WL 3392869 (S.D.N.Y. July 12, 2018) (holding that police officers "had at least arguable probable cause to support the arrest of [the] plaintiff" and were therefore "entitled to qualified immunity as to [the plaintiff's] unreasonable search and seizure claim").  The defendants are thus entitled to qualified immunity as a matter of law, and the defendants' Motion for Summary Judgment as to Count One is granted.

---

[22] It is also possible that, by including a separate Count alleging "violation of 42 U.S.C. § 1983", plaintiff is simply using section 1983 as an enforcement vehicle—along with Connecticut state law—for the substantive claims in Counts Two, Three, and Four, which allege false arrest, malicious prosecution, and retaliatory prosecution.

SPA-033

### V.      CONCLUSION

For the reasons stated above, the defendants' Motion for Summary Judgment

(Doc. No. 80) is granted.  The Clerk is directed to enter judgment in favor of the

defendants and close the case.


**SO ORDERED.**

Dated at New Haven, Connecticut this 26th day of September 2023.


       /s/ Janet C. Hall
Janet C. Hall
United States District Judge

SPA-034

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WENDY ALBERTY

     v.                                3:20CV1014(JCH)

ROBERT A. HUNTER,
STEPHEN J. SAMSON,
DANIEL DEPTULA,

<u>JUDGMENT</u>

This matter came on before the Honorable Janet C. Hall, United States District

Judge, as a result of defendant's Motion for Summary Judgment.

The Court has reviewed all of the papers filed in conjunction with the Motion and

on September 26, 2023, entered a Ruling granting the defendant's Motion.

Therefore, it is ORDERED and ADJUDGED that judgment is entered for the

defendants, Robert A. Hunter, Stephen J. Samson, and Daniel Deptula, against the

plaintiff, Wendy Alberty, and the case is closed.

Dated at New Haven, Connecticut, this 26th Day of September, 2023.

Dinah Milton Kinney, Clerk

By <u>/s/ Christina Sichanh</u>
 Christina Sichanh
 Deputy Clerk

Entered on Docket <u>9/26/2023</u>